1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  OWEN J. CLEMENTS, State Bar #141805
   Chief of Special Litigation
3  THERESA L. MUELLER, State Bar #172681
   Chief Energy and Telecommunications Deputy
4  WILLIAM K. SANDERS, State Bar #154156
   Deputy City Attorney
5  City Hall Room 234
   1 Dr. Carlton B. Goodlett Place
6  San Francisco, California 94102-4682
   Telephone:     (415) 554-6771
7  Facsimile:     (415) 554-4757
   E-Mail:        william.sanders@sfgov.org
8
9  Attorneys for Movant/Intervenor
   CITY AND COUNTY OF SAN FRANCISCO
10
11
12              UNITED STATES DISTRICT COURT
13           NORTHERN DISTRICT OF CALIFORNIA
14                SAN FRANCISCO DIVISION

15  SAN FRANCISCO CHAPTER OF THE          Case No. C-07-4936-JCS
    A. PHILLIP RANDOLPH INSTITUTE,
16  LYNNE BROWN, REGINA HOLLINS,          **NOTICE OF MOTION AND MOTION
                                          OF THE CITY AND COUNTY OF SAN
17  on behalf of themselves and others    FRANCISCO TO INTERVENE AS A
    similarly situated and the general public    DEFENDANT IN THIS PROCEEDING**
18
                   Plaintiffs,            Hearing Date:   November 30, 2007
19                                        Time:           9:30 a.m.
             vs.                          Place:          Courtroom A, 15th Floor
20
    UNITED STATES ENVIRONMENTAL
21  PROTECTION AGENCY, STEPHEN
    JOHNSON, BAY AREA AIR QUALITY
22  MANAGEMENT DISTRICT, MARK
    ROSS,
23
                   Defendants.
24
25
26
27
28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

NOTICE OF MOTION ............................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

I.     INTRODUCTION AND SUMMARY OF ARGUMENT .................... 1

II.    STATEMENT OF FACTS ........................................................... 3

      A.    San Francisco's Future Electricity Needs ................................. 3

      B.    The San Francisco Action Plan and the Development of the SFERP .......... 4

      C.    Regulatory Approvals Required for the SFERP ........................... 7

      D.    Appeals from the CEC Order and FCOD ................................. 9

      E.    Community Support for the SFERP ...................................... 9

      F.    The Complaint in this Proceeding ...................................... 10

      G.    The City Will File a Motion to Dismiss .................................. 12

III.   LEGAL STANDARD ............................................................... 13

      A.    Legal Standard for Intervention as of Right ............................ 13

      B.    The Legal Standard for Permissive Intervention ....................... 14

      C.    Procedural Requirements for Intervention ............................. 15

IV.   ARGUMENT ....................................................................... 15

      A.    The Court Should Grant the City's Motion To Intervene as of Right ....... 15

            1.    The City's motion is timely. ........................................ 15

            2.    The City has a significantly protectable interest in the property or transactions that are the subject matter of this action. ............... 15

            3.    The City is so situated that the disposition of the action may as a practical matter impair or impede the City's ability to protect its interests. ...................................................... 16

            4.    The parties to the action do not adequately represent the City's interests. ...................................................... 17

      B.    The Court Should Grant the City's Motion for Permissive Intervention ... 17

      C.    The City's Motion Complies with the Procedural Requirements of Rule 24(c) ....................................................... 17

V.    CONCLUSION ...................................................................... 18

## **TABLE OF AUTHORITIES**

**Federal Cases**

*Arakaki v. Cayetano*
   324 F.3d 1078 (9th Cir. 2003) ............................................................................14

*Beckman Industries, Inc. v. International Insurance Co.*
   966 F.2d 470  (9th Cir. 1992) ............................................................................15

*Bituminous Materials, Inc. v. Rice County*
   126 F.3d 1068 (8th Cir. 1997) ............................................................................16

*California ex rel. Lockyer v. United States*
   450 F.3d 436 (9th Cir. 2006) ...............................................................13, 14, 17

*Forest Conservation Council v. United States Forest Service*
   66 F.3d 1489 (9th Cir. 1995) .....................................................................13, 16

*Kootenai Tribe of Idaho v. Veneman*
   313 F.3d 1094 (9th Cir. 2002) ............................................................................14

*Massachusetts v. Environmental Protection Agency*
   127 S. Ct. 1438 (2007)...............................................................................10, 11

*Massachusetts v. Environmental Protection Agency*
   2007 WL 2935594 (D.C. Cir., Sept. 17, 2007) .......................................................11

*Prete v. Bradbury*
   438 F.3d 949 (9th Cir. 2006) ............................................................................15

*Securities and Exchange Commission  v. United States Realty & Improvement Co.*
   310 U.S. 434 (1940) ............................................................................14

*Southern California Edison Co. v. Lynch*
   307 F.3d 794 (9th Cir. 2002) ............................................................................13

*Southwest Center for Biological Diversity v. Berg*
   268 F.3d 810 (9th Cir. 2001) ............................................................................14

*United States v. Alisal Water Corp.*
   370 F.3d 915 (9th Cir. 2004). ............................................................................14

*United States v. City of Los Angeles*
   288 F.3d 391 (9th Cir. 2002) ............................................................................16

*United States v. Washington*
   86 F.3d 1499 (9th Cir. 1996) ............................................................................13

**State Case**

*Californians for Renewable Energy v. California Energy Commission*
   2007 Cal. Lexis 2018 (Feb. 28, 2007) .................................................................9

**Federal Statutes**

Federal Rules of Civil Procedure

Rule 24..................................................................................................................1
Rule 24(a)........................................................................................................1, 13
Rule 24(b)..................................................................................................1, 14, 17
Rule 24(c)......................................................................................................15, 17

**Other Authorities**

Baker, *Vote Near on new S.F. Power Generating Plant*, S.F. Chronicle (Oct. 19, 2007)...............5

Ramo, *Warding Off CEQA Lawsuits: Advice from a Plaintiff's Lawyer*
    30 Real Property Law Reporter 101 (July 2007) ........................................................9

1

**NOTICE OF MOTION**

2
TO PLAINTIFFS, DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

3
      PLEASE TAKE NOTICE that, on November 30, 2007, at 9:30 a.m. or as soon thereafter as

4
counsel may be heard in the above-entitled Court, located at 450 Golden Gate Avenue, San

5
Francisco, California 94102, movant/intervenor the City and County of San Francisco (the "City")

6
will move this Court, before the Honorable Joseph C. Spero, United States Magistrate Judge, for an

7
order, pursuant to Federal Rule of Civil Procedure 24, granting the City leave to intervene as a

8
defendant in this proceeding. The grounds for the City's motion to intervene as of right under

9
Federal Rule of Civil Procedure 24(a) are that the City has an interest in the transaction that is the

10
subject of this proceeding so that the disposition of this action may impede the City's ability to

11
protect its interests. The grounds for the City's motion for permissive intervention under Federal

12
Rule of Civil Procedure 24(b) are that the City's defenses in this proceeding share common questions

13
of law or fact with those of the parties and that the City's intervention at this time will not cause any

14
undue delay or prejudice.

15
      The motion is based upon this notice of motion, the attached memorandum of points and

16
authorities, the declaration of Susan Leal submitted herewith, and upon such other matters as may be

17
presented to the Court at the time of the hearing.

18

**MEMORANDUM OF POINTS AND AUTHORITIES**

19
**I.    INTRODUCTION AND SUMMARY OF ARGUMENT**

20
      For a number of years now, the City has worked diligently with community members to

21
replace old, inefficient and dirty electric generating plants located in the southeast part of San

22
Francisco with a modern, clean facility powered by three combustion turbine ("CT") generators (the

23
San Francisco Electric Reliability Project ("SFERP")). In order to do so, the City had to obtain a

24
number of permits, one of which was from defendant Bay Area Air Quality Management District

25
("BAAQMD"). After a lengthy process, the City has obtained most of those permits, including a

26
Final Determination of Compliance from BAAQMD. The only regulatory permit still required is an

27
Authority to Construct ("ATC") from BAAQMD. As explained below, this is a ministerial permit.

28

Plaintiffs San Francisco Chapter of the A. Phillip Randolph Institute, *et al.* are among a small number of entities, groups and individuals that oppose the SFERP. Because all of their legal efforts to challenge the City's permits directly, either administratively or through the state courts, have been exhausted, plaintiffs have filed this federal court complaint seeking to enjoin BAAQMD from issuing the ATC for reasons unrelated to the City's compliance with *existing* federal and state air quality control standards. Instead, plaintiffs claim that in *Massachusetts v. Environmental Protection Agency* the United States Supreme Court recently ordered defendant United States Environmental Protection Agency ("EPA") to reassess its prior determination that it did not have the authority under the Clean Air Act to regulate greenhouse gas emissions from new motor vehicles. Plaintiffs further claim that the EPA has failed to properly respond to the Supreme Court's directive and, therefore, they seek an order from this Court requiring the EPA to do so. Although the City shares plaintiffs' desire to promote aggressive greenhouse gas regulation, such desire provides no basis for this complaint.[1]

Nowhere in their complaint do plaintiffs allege that BAAQMD violated any existing federal or state air quality standards or regulations by issuing the Final Determination of Compliance, or that BAAQMD will violate any existing standards or regulations by issuing the ATC when the City makes the request. Instead, plaintiffs claim that this Court should enjoin BAAQMD from issuing the ATC because: (i) there is a risk the SFERP could be constructed before the EPA implements a greenhouse gas regulatory scheme that would include power plants; (ii) in the event the EPA ultimately promulgates greenhouse gas emission rules for power plants at some time in the future, BAAQMD would have to incorporate those rules into its consideration of the City's application; or (iii) in the event BAAQMD issues the ATC, and the City constructs the facility before the EPA acts, there will be no way to undo the harm allegedly caused by the SFERP.

All of these scenarios are based on three premises, none of which can provide a basis for a properly pleaded complaint.

---

[1] The City is working diligently both on state and local levels to reduce greenhouse gas emissions. (*See* Leal Dec. at ¶¶ 34-39.)

First, plaintiffs' assume the EPA will ultimately promulgate a regulatory scheme for greenhouse gases from a source such as a power plant. There is nothing in the Supreme Court's decision that requires this result from the EPA. The Supreme Court case concerned greenhouse gas emissions from *motor vehicles* only.

Second, plaintiffs' assume the EPA's new regulatory scheme could become part of the BAAQMD permitting process in the future. It is pure speculation whether these regulations would even include power plants, let alone what form these regulations would take.

Third, plaintiffs' assume the EPA's new regulatory scheme would somehow apply to permit applications that predate the implementation of these regulations. There is nothing in the record to suggest that any new regulations would be retroactively applied to previously issued permits. In fact, even the petitioners in the Supreme Court case had only asked the EPA to regulate greenhouse gas emissions from *new* motor vehicles. As a result, this Court cannot rely on these allegations to enjoin BAAQMD from issuing the ATC.

As further discussed below, the City has an important interest in opposing the plaintiffs' efforts to use this complaint against the EPA and BAAQMD to halt the issuance of the ATC. In fact, the City is the real-party-in-interest in this proceeding. The ultimate relief sought is an injunction that, while directed at BAAQMD, would prevent the City from commencing construction of the SFERP.

This Court, therefore, should grant the City's motion to intervene in this proceeding.

## II.    STATEMENT OF FACTS

### A.    San Francisco's Future Electricity Needs

Residents and businesses in San Francisco receive their electric power from high-voltage transmission lines that run up the Peninsula and from electricity generating units in the City. The electric power from all of these sources is needed to ensure there is a reliable supply to meet San Francisco's needs, especially during times of peak power use. (Declaration of Susan Leal in Support of the Motion of the City and County of San Francisco To Intervene as a Defendant in this Proceeding ("Leal Dec.") at ¶ 7.)

For decades the City's electric reliability has depended on two old, dirty, and inefficient power plants – the Hunters Point Power Plant (owned by Pacific Gas and Electric Co.) and the Potrero Power Plant (owned by Mirant Potrero, LLC). The City and community advocates worked for many years to develop a plan for closing these power plants in order to improve public health, protect the environment, improve electric reliability and promote environmental justice, among other objectives. These goals were set forth in the City's Electricity Resource Plan, which was developed by the San Francisco Public Utilities Commission ("SFPUC") and the San Francisco Department of the Environment ("SFDOE"), and subsequently endorsed by the City and County of San Francisco Board of Supervisors ("Board"). (Leal Dec. at ¶ 8 and Exhibit A.[2])

**B.    The San Francisco Action Plan and the Development of the SFERP**

In their complaint, the plaintiffs challenge the City's efforts to build the SFERP in the Potrero district of Southeast San Francisco. In so doing, plaintiffs ignore that the SFERP is an integral part of the City's plan to close the Hunters Point and Potrero Power Plants.

The City, working with community members and State agencies, has spent over four years developing the SFERP. (Leal Dec. at ¶ 4.) It started in January 2003 when the Board adopted an ordinance approving a settlement of a claim the City had against the Williams Energy Companies ("Williams"). As part of this settlement, the City took ownership of four CT generators owned by Williams, which the City could develop into small power plants in order to improve the City's electric reliability and replace the Hunters Point and Potrero Power Plants. At the same time, the Board adopted a resolution approving a contract with the California Department of Water Resources ("CDWR"), under which the State of California would purchase the electricity generated by the power plants. (Leal Dec. at ¶ 4.)

Also as part of the settlement, the City entered into an Implementation Agreement with the California Attorney General, the California Consumer Power and Conservation Financing Authority and the CDWR. Pursuant to the Implementation Agreement, the City obtained the CT generators to

---

[2] Leal Dec. Exhibit A is the Executive Summary of the Electricity Resource Plan. A copy of the complete document can be found at www.sfgov.org/site/frame.asp?u=http://www.sfwater.org.

1    develop electric generating facilities in the City.  The Implementation Agreement also provided that

2    the City would be reimbursed for the development costs through funds provided by the Attorney

3    General.  (Leal Dec. at ¶ 5.)

4        Following the Board's approval of the ordinance and resolution, the City began to develop the

5    SFERP, which consists of a 145 megawatt plant in the Potrero neighborhood of San Francisco (three

6    CT generators).  The City also began to develop a 48 megawatt plant at the San Francisco

7    International Airport (one CT generator).  (Leal Dec. at ¶ 6.)

8        As a result of these efforts, in November 2004 the California Independent System Operator

9    ("CAISO")[3] adopted the San Francisco Action Plan ("Action Plan"), which detailed the need for the

10    City's CT projects and a number of transmission projects to displace the reliability need for the

11    Hunters Point and the Potrero Power Plants.  (Leal Dec. at ¶ 9 and Exhibit B.)

12        Since the adoption of the Action Plan in 2004, the CAISO has continued to emphasize that

13    new generation in the City is required in order to allow for the closure of these old power plants.  In a

14    letter to Supervisor Sophie Maxwell dated July 12, 2007, the CAISO reiterated its commitment to the

15    Action Plan, including the requirement for electrical generation in San Francisco.[4]  (Leal Dec. at ¶ 10

16    and Exhibit C.)

17        The Action Plan identified fifteen projects needed to permit the closure of these old power

18    plants in the City.  In March 2007, the CAISO identified an additional transmission project, the

19    Martin-Hunters Point Cable, which was necessary to permit the closure of the Potrero Power Plant.

20    (Leal Dec. at ¶ 11.)

21

22

23    ───────────────
      [3]  The California Independent System Operator is a not-for-profit public-benefit corporation
24    that is charged with operating the majority of California's high-voltage wholesale power grid.  (Leal
      Dec. at ¶ 9 n.2.)

25    [4]  As recently as October 19, 2007, Gregg Fishman, a spokesman for the CAISO, told the
      SFPUC that, "[e]ven if you could significantly add to the transmission system to bring power into San
26    Francisco, you'd still want to have some generation in San Francisco."  (Baker, *Vote Near on new
      S.F. Power Generating Plant*, S.F. Chronicle (Oct. 19, 2007) p. B-1, a copy of this article can be
27    found at: http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/10/19/BUBOSSF48.DTL&hw=
      Mirant&sn=002&sc=538).)

28

1   The transmission projects required for the shut down of the Hunters Point Power Plant have

2   been completed. In May 2006, Pacific Gas and Electric Co. permanently closed the Hunters Point

3   Power Plant. (Leal Dec. at ¶ 12.)

4   Most of the transmission projects identified in the Action Plan have been completed and the

5   remaining project is expected to be completed at about the same time as the City's CT projects. As a

6   result, when the City's CT projects are operational the Potrero Power Plant will no longer be needed

7   for reliability. Mirant has stated in public meetings that it is willing to close the Potrero Power Plant

8   when it is no longer needed for reliability, subject to Mirant obtaining assistance from the City in

9   redeveloping the site. The City continues to work with Mirant to ensure closure of the Potrero Power

10  Plant. (Leal Dec. at ¶ 13.)

11  The need for the City's CT projects is heightened by the fact that the Potrero Power Plant

12  cannot be relied on beyond 2008. The water discharge permit for the main operating unit at the

13  Potrero Power Plant will expire in 2008. The Regional Water Quality Control Board has stated its

14  intention to deny further permit extensions unless Mirant upgrades the plant's cooling technology or

15  shows that the San Francisco Bay is not being harmed by the plant's outdated cooling system.

16  (Leal Dec. at ¶ 14.)

17  The SFERP is important for the City for a number of reasons. First, local control of in-City

18  generation can reduce the risk of market power abuses and enable the City to mandate the use of

19  cleaner fuels when feasible or to close down any such generation when it is no longer needed.

20  (Leal Dec. at ¶ 15.)

21  Second, the record before the California Energy Commission ("CEC") shows that the SFERP

22  will improve air quality relative to continued operation of the Potrero Power Plant. The SFERP is

23  equipped with state of the art pollution control equipment and will result in significant reductions in

24  both ozone precursor emissions and particulate precursor emissions as compared to the main unit at

25  the Potrero Power Plant. Even though the annual particulate emissions from the SFERP are expected

26  to be lower than those from the Potrero Power Plant, the City will implement an aggressive

27  particulate mitigation program in the affected community. Moreover, the SFERP will also replace

28

1    three highly polluting small peaking generators at the Potrero Power Plant, which operate on diesel

2    fuel and have no emissions reduction equipment.

3    Third, the record before the CEC shows that the SFERP will improve the water quality and

4    aquatic habitat in the San Francisco Bay by replacing the Potrero Power Plant.  The Potrero Power

5    Plant uses a system known as "once-through cooling" where water is taken from the Bay, used to

6    cool the power plant, and then discharged back into the Bay at high temperatures.  The technology

7    causes impingement and entrainment impacts to aquatic life as well as thermal effects in the area

8    surrounding the discharge.  The discharge also stirs up polluted sediments and disperses them through

9    a wider area.  The SFERP, on the other hand, will use recycled water for cooling and will not

10   discharge cooling water into the Bay. (Leal Dec. at  ¶ 17.)

11   Fourth, the Potrero Power Plant has had an outage rate well above the system average for

12   power plants operating within California.  In contrast, the SFERP will use newer technology with a

13   proven record of reliability.  (Leal Dec. at ¶ 18.)

14   Fifth, the SFERP is operationally flexible, making it ideally suited to complement the City's

15   aggressive goals for the deployment of renewable resources.  (Leal Dec. at ¶¶ 19 and 34-39.)

16       **C.    Regulatory Approvals Required for the SFERP**

17   Since the City obtained the CT generators from Williams, the City has worked diligently to

18   obtain all of the regulatory approvals necessary to construct the SFERP.  Part of that process was to

19   obtain a certification from the CEC.[5]  (Leal Dec. at ¶ 20.)

20   On March 18, 2004, the City filed an Application for Certification ("AFC") with the CEC to

21   construct and operate the plant, which was then slated to be located at the site presently used by

22   Mirant of the Potrero Power Plant.  (Leal Dec. at ¶ 21.)

23   On March 25, 2005, the City filed an amendment to the AFC in which the City proposed

24   relocating the SFERP to a 4-acre parcel owned by the City that is located south of 25th Street and

25   _____

26       [5]  The California Energy Commission is the state's primary energy policy and planning
agency.  One of the CEC's responsibilities is to license thermal power plants in excess of 50

27   megawatts, which would include the SFERP.  (Leal Dec. at ¶ 20 n.3.)

28

MOTION TO INTERVENE                                    7
Case No. C-07-4936-JCS

1  approximately 900 feet east of Illinois Street (approximately a 1/4 mile from the original location).

2  (Leal Dec. at ¶ 22.)

3      After a comprehensive review of the SFERP, including an analysis of the potential economic,

4  public health and safety, reliability, engineering, and environmental ramifications of the project and

5  an extensive review of alternatives, the CEC adopted an order approving the City's AFC. (CEC

6  Order No. 06-1003-01, dated October 3, 2006 ("CEC Order). (Leal Dec. at ¶ 23 and Exhibit D.)

7  Among other things, the CEC found that the SFERP will "provide a degree of economic benefits and

8  electricity reliability to the local area." The CEC further found that the required conditions of

9  certification will: (a) "ensure that the project will be designed, sited, and operated in conformity with

10  applicable local, regional, state, and federal laws, ordinances, regulations, and standards, including

11  applicable public health and safety standards, and air and water quality standards;" and (b) further

12  "ensure protection of environmental quality and assure reasonably safe and reliable operation of the

13  facility. . . [without] result[ing] in, [ ]or contribut[ing] substantially to, any significant direct, indirect,

14  or cumulative adverse environmental impacts." (CEC Order at 1-2.)

15      Air quality concerns were an important part of the CEC certification process. As part of that

16  process, the City was required to obtain a Determination of Compliance from BAAQMD. (Leal Dec.

17  at ¶ 24.)

18      On July 26, 2005, BAAQMD issued a Preliminary Determination of Compliance ("PDOC").

19  On November 22, 2005, BAAQMD issued a Final Determination of Compliance ("FDOC"). (Leal

20  Dec. at ¶ 25 and Exhibit E.)

21      After a review and detailed scientific analysis of the potential emissions from the SFERP,

22  BAAQMD determined that the SFERP would comply with all applicable federal and state air quality

23  laws, provided that the City complied with the conditions of compliance set forth in the FDOC.

24  (FDOC at 18.) The CEC then included the conditions of compliance in the PDOC in the CEC Order.

25  (Leal Dec. at ¶ 27.)

26      Before the City can begin construction of the SFERP, BAAQMD must issue the City the

27  ATC. Under BAAQMD Rules and Regulations, BAAQMD must issue the ATC if the CEC Order

28  contains all of the conditions required by BAAQMD. (BAAQMD Regulation 2-3-301 and 2-3-405.)

1    (Leal Dec. at ¶ 28 and Exhibit F.)  Neither BAAQMD nor any interested party has questioned the

2    completeness of the CEC Order in this regard.  (Leal Dec. at ¶ 28.)

3    **D.    Appeals from the CEC Order and FCOD**

4        Plaintiff Lynne Brown along with some other persons and entities sought judicial review of

5    the CEC Order with the California Supreme Court.  The California Supreme Court denied the petition

6    for a writ of mandate/prohibition.  (Leal Dec. at ¶ 29.)  See *Californians for Renewable Energy v.*

7    *California Energy Commission*, 2007 Cal. Lexis 2018 (Feb. 28, 2007).

8        Plaintiffs A. Phillip Randolph Institute and Lynne Brown along with some other persons and

9    entities recently filed a request that the CEC "reopen" the CEC's certification of the SFERP.  This

10   request is procedurally and substantively defective and the City will oppose it on these grounds.

11   (Leal Dec. at ¶ 30.)

12       Plaintiff Lynne Brown along with some other persons and entities filed an appeal of the

13   FDOC with BAAQMD.  On April 15, 2006, BAAQMD issued an order dismissing that appeal.

14   (Leal Dec. at ¶ 26.)

15   **E.    Community Support for the SFERP**

16       The City has worked diligently to gain community support for the City's CT projects as part

17   of a comprehensive plan for a cleaner, more efficient, and more reliable energy system to serve San

18   Francisco.  As part of this work, the City held numerous community meetings and modified the

19   location, scope  and design of the project to address community concerns.  As a result, there is

20   community support for the SFERP in the City.[6]  (Leal Dec. at  ¶ 31.)

21       On July 12, 2007, the City and County of San Francisco Power Plant Task Force adopted by a

22   5-0 vote a resolution recommending that the Board approve the City's CT projects including the

23

24       [6]  In fact, the City's efforts in this regard were recently lauded in an article in the Real
     Property Law Reporter.  *See* Ramo, *Warding Off CEQA Lawsuits: Advice from a Plaintiff's Lawyer*
25   30 Real Property Law Reporter 101, 102-03 (July 2007).  As Mr. Ramo noted, despite the difficulties
     in siting a fossil fuel power plant, the City managed to get community support by holding a series of
26   meetings in which the City thoroughly discussed with neighborhood groups "alternative sites,
     alternative energy ideas and [environmental] mitigation measures."  *Id*. at 103.  "By the time the City
27   filed its application with the [CEC], little opposition remained, and the application was approved
     unanimously."  *Id*.

28

1   SFERP.  The Power Plant Task Force consists of seven voting members appointed by the Board,

2   including a resident of each of the following:  Mission Bay, Bayview Hunters Point, Potrero Hill area,

3   and the Central Waterfront.[7]  The Board charged the Power Plant Task Force with advising it on

4   power policy issues related to the construction of new power generating facilities in the Southeast

5   portion of San Francisco, power demand management, and energy policy for the City.  (Leal Dec. at

6   ¶ 32.)

7       A number of neighborhood groups in Southeast San Francisco have expressed support for the

8   SFERP.  For instance, the Potrero Boosters Neighborhood Association ("PBNA") and Dogpatch

9   Neighborhood Association ("DNA") were intervenors in the CEC proceeding.  In comments filed

10  with the CEC, PBNA and DNA informed the CEC that the SFERP represented a move away from

11  environmental injustice and would smooth the "transition to cleaner renewable energy development."

12  (Leal Dec. at ¶ 33.)

13      **F.    The Complaint in this proceeding**

14      On September 24, 2007, plaintiffs filed this complaint against the EPA and BAAQMD.  The

15  complaint seeks to require the EPA to open a proceeding to promulgate a regulatory scheme for

16  greenhouse gas emissions and to require BAAQMD to withhold issuing the ATC allowing the City to

17  construct the SFERP until such time as the EPA has acted.  (Complaint for Declaratory and Injunctive

18  Relief ("Complaint").)  The genesis of the plaintiffs' Complaint is the Supreme Court's decision in

19  *Massachusetts v. Environmental Protection Agency*, 127 S. Ct. 1438 (2007).

20      In that case, the State of Massachusetts, along with other states, local governments and

21  environmental agencies, sought review of an EPA order denying a petition asking the EPA to open a

22  rulemaking to regulate greenhouse gas emissions from new motor vehicles.  The EPA had determined

23  in that proceeding that: (i) the Clean Air Act did not authorize it to issue regulations to address global

24  climate change because greenhouse gases were not "air pollutants" as that term is defined in the

25

26

27      [7]  On the day of the vote, only six members had been appointed and only five were present.
    (Leal Dec. at ¶ 32 n.5.)

28

1  Clean Air Act; and (ii) even if the EPA had the authority to regulate greenhouse gas emissions, it

2  would refuse to exercise it for a variety of reasons. *Id*. at 1450-51.

3         The Supreme Court rejected the EPA's finding as to its authority under the Clean Air Act.

4  The Court held that, because "greenhouse gases fit well within the Clean Air Act's capacious

5  definition of 'air pollutant,' . . . the EPA has the statutory authority to regulate the emission of such

6  gases from new motor vehicles." *Id*. at 1462.

7         The Supreme Court also rejected the EPA's finding that, even if it had the authority to

8  regulate greenhouse gas emissions, "it would be unwise to do so at this time." *Id*. The Court found

9  instead that the EPA had a duty under the Clean Air Act to make a "judgment . . . whether an air

10 pollutant causes or contributes to . . . air pollution which may be reasonably anticipated to endanger

11 public health or welfare." *Id*. (internal quotation marks and alterations omitted). Because the EPA

12 offered no "reasoned explanation for its refusal" to act, the Supreme Court remanded the matter to the

13 Court of Appeals for District of Columbia Circuit for "further proceedings consistent with this

14 opinion." *Id*. at 1463.[8] The Supreme Court found, however, that it did not need to address, nor did

15 its decision actually address, "the question whether on remand EPA must make an endangerment

16 finding, or whether policy concerns can inform EPA's actions in the event that it makes such a

17 finding." *Id*.

18        In the Complaint, plaintiffs allege that, despite the Supreme Court's decision, the EPA has

19 failed to "re-assess[ ]" its "refusal to regulate" greenhouse gas emissions or to "accept[ ] the logic

20 stressed by the Supreme Court: that greenhouse gases must be regulated." (Complaint for

21 Declaratory and Injunctive Relief ("Complaint") at ¶ 5.) Plaintiffs go on to allege that the EPA's

22 failure to respond to the Supreme Court's "demand" is an "agency action unlawfully withheld as well

23 as unreasonably delayed in violation of the Administrative Procedure Act." (Complaint at ¶ 60.)

24 Plaintiffs then claim they are injured as a result of the EPA's inaction because, if BAAQMD issues

25 the ATC, plaintiffs will "receive in their neighborhood a power plant whose full environmental and

---

26        [8] The Court of Appeals for the District of Columbia Circuit recently remanded the matter to
   the EPA for "further proceedings consistent with the Supreme Court's opinion." *Massachusetts v.*
27 *Environmental Protection Agency*, 2007 WL 2935594, at *1 (D.C. Cir., Sept. 17, 2007).

28

1   health effects have not been assessed or made available for public comment." (Complaint at ¶ 61.)

2   Plaintiffs thus seek an order from the Court requiring the EPA to "respond" to the Supreme Court's

3   "demand" before any permits for projects like the SFERP could be issued. (Complaint at p. 13, ¶ 1.)

4       While the claim against the EPA alleges a violation of law (the Administrative Procedure

5   Act), the separately stated claim against BAAQMD does not. Plaintiffs do not claim that BAAQMD

6   unlawfully issued any permit to the City, or that BAAQMD will violate any existing federal or state

7   law if it subsequently issues the ATC. In fact, plaintiffs' claim against the EPA stems from the fact

8   the EPA has not imposed any regulations on greenhouse gas emissions either from new motor

9   vehicles or from any other sources.

10      Instead, plaintiffs' claim against BAAQMD is predicated on the allegation that, *at some*

11  *undetermined time in the future*, the EPA *might* promulgate rules and regulations that *should* have

12  "been incorporated into the analysis that led to the issuance" of BAAQMD's permit to the City

13  related to the SFERP. (Complaint at ¶ 67.) Based on those allegations, plaintiffs seek an order from

14  this Court enjoining BAAQMD from issuing the ATC or "taking any action" with respect to the

15  SFERP until the EPA has complied with the Supreme Court's directive and, if necessary, BAAQMD

16  conducts further review of the City's application in accordance with any new EPA regulations.

17  (Complaint at p. 13, ¶¶ 2-5.)

18      While the Complaint is couched in these terms, a review of the Complaint reveals that the

19  plaintiffs' real goal is to stop the SFERP for reasons unrelated to the allegations contained therein.

20  As plaintiffs allege, their main objection to the SFERP is "not before this Court." (Complaint at ¶

21  40.) That objection is that the "CEC improperly rejected alternative, non-polluting proposals to meet

22  San Francisco's future energy needs, as well as alternative sites for the SFERP that would not

23  endanger residents [of Southeast San Francisco]." (Complaint at ¶ 39.)

24      **G.    The City Will File a Motion to Dismiss**

25      If this Court grants the City's motion to intervene, the City will file a motion to dismiss

26  plaintiffs' claim seeking to enjoin BAAQMD from issuing the ATC. As thoroughly discussed herein,

27  the Complaint is defective. Plaintiffs have filed to state a claim upon which such relief can be

28  granted.

1    **III.    LEGAL STANDARD**

2      **A.    Legal Standard for Intervention as of Right**

3        The City seeks leave to intervene as a matter of right under Federal Rule of Civil Procedure

4 24(a). The courts construe Rule 24(a) "liberally in favor of potential intervenors." *California ex rel.*

5 *Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006). As the Ninth Circuit has explained:

6          A liberal policy in favor or intervention serves both efficient resolution of
         issues and broadened access to the courts. By allowing parties with a *practical*

7          interest in the outcome of a particular case to intervene, we often prevent or
         simplify future litigation involving related issues; at the same time, we allow

8          an additional interested party to express its views before the court.

9 *Forest Conservation Council v. United States Forest Service*, 66 F.3d 1489, 1496 n.8 (9th Cir. 1995).

10        The Ninth Circuit applies a four-part test to an application to intervene as a matter of right:

11 "(1) the motion must be timely; (2) the applicant must claim a 'significantly protectable' interest that

12 relates to the property or transaction which is the subject of the action; (3) the applicant must be so

13 situated that the disposition of the action may as a practical matter impair or impede its ability to

14 protect its interest; and (4) the applicant's interest must be inadequately represented by the parties to

15 the action." *Id.* at 1493.

16        The timeliness requirement generally looks to such factors as the stage of the proceeding, the

17 prejudice to the parties from any delay in seeking to intervene, and the reason for any delay in

18 seeking to intervene. *United States v. Washington*, 86 F.3d 1499, 1503 (9th Cir. 1996).

19        The applicant has a significantly protectable interest in an action if: "(1) it asserts an interest

20 that is protected under some law, and (2) there is a relationship between its legally protected interest

21 and the plaintiff's claims." *Lockyer*, 450 F.3d at 441 (internal quotation marks omitted). The interest

22 test requires the court to make a "practical, threshold inquiry" and is "primarily a practical guide to

23 disposing of lawsuits by involving as may apparently concerned persons as is compatible with

24 efficiency and due process." *Southern California Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir.

25 2002) (internal quotation marks omitted).

26        The requirement that the disposition of the matter will impede the proposed intervenor's

27 interests is generally easily met if the applicant has a significantly protectable interest. "'[I]f an

28 absentee would be substantially affected in a practical sense by the determination made in an action,

1  he should, as a general rule, by entitled to intervene.'" *Southwest Center for Biological Diversity v.*

2  *Berg*, 268 F.3d 810, 822 (9th Cir. 2001) (quoting Fed. R. Civ. P. 24 advisory committee note to 1996

3  amendment); see also *Lockyer*, 450 F.3d. at 442 ("Having found that appellants have a significant

4  protectable interest, we have little difficulty concluding that the disposition of this case may, as a

5  practical matter, affect it."). The only qualification to this general rule is that the applicant must show

6  that it has no "other means" to protect its interest. *United States v. Alisal Water Corp.*, 370 F.3d 915,

7  921 (9th Cir. 2004).

8      The requirement that the parties do not already protect the applicant's interests generally

9  concerns whether the applicant and an existing party "have the same ultimate objective" in the case.

10  *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). The burden on showing inadequate

11  representation is "minimal" and could be satisfied by demonstrating that the present parties'

12  "representation of their interests may be inadequate." *Id.* (internal quotation marks omitted). The

13  Court must determine whether: (i) the present parties "will undoubtedly make all of a proposed

14  intervenor's arguments;" (ii) the present parties are "capable" of and "willing" to make these

15  arguments; and (iii) the proposed intervenor "would offer any necessary elements to the proceedings

16  that other parties would neglect." *Id.*

17      **B.    The Legal Standard for Permissive Intervention**

18      The City also seeks permissive intervention under Federal Rule of Civil Procedure 24(b).

19  Like a motion under Rule 24(a), a permissive intervention must be timely. Fed. R. Civ. P. 24(b). The

20  ground for permissive intervention is that the intervenors "claim or defense and the main action have

21  a question of law or fact in common." Fed. R. Civ. P. 24(b). Rule 24(b) "plainly dispenses with any

22  requirement that the intervenor shall have a direct or pecuniary interest in the subject of the

23  litigation." *Securities and Exchange Commission v. United States Realty & Improvement Co.*, 310

24  U.S. 434, 459 (1940).

25      "If there is a common question of law or fact, the requirement of the rule has been satisfied

26  and it is then discretionary with the court whether to allow intervention." *Kootenai Tribe of Idaho v.*

27  *Veneman*, 313 F.3d 1094, 1109 (9th Cir. 2002). In exercising its discretion, the district court must

28

1    consider whether intervention will "unduly delay or prejudice the adjudication of the rights of the

2    original parties." Fed. R. Civ. P. 24(b).

3        **C.    Procedural Requirements for Intervention**

4            Under Federal Rule of Civil Procedure 24(c), a person "desiring to intervene" must serve a

5    motion on all the parties. Fed. R. Civ. P. 24(c). The motion must state the "grounds therefore" and

6    must be "accompanied by a pleading setting forth the claim or defense." Fed. R. Civ. P. 24(c). The

7    Ninth Circuit has rejected a "literal" construction of Rule 24(c). *Beckman Industries, Inc. v.*

8    *International Insurance Co.*, 966 F.2d 470, 474 (9th Cir. 1992). Instead, that court has construed

9    Rule 24(c) to simply require that an applicant for intervention include in the motion a full statement

10   of the "legal and factual grounds for intervention." *Id.*

11   **IV.    ARGUMENT**

12       **A.    The Court Should Grant the City's Motion To Intervene as of Right**

13           **1.    The City's motion is timely.**

14           Here, there can be no reasonable dispute that the City's motion is timely. See, e.g., *Prete v.*

15   *Bradbury*, 438 F.3d 949, 954 (9th Cir. 2006) (plaintiffs "wisely concede" that a motion to intervene

16   brought six days after the complaint was filed was timely). The plaintiffs filed the complaint on

17   September 24, 2007. To date, neither of the defendants has even appeared in this proceeding.

18           **2.    The City has a significantly protectable interest in the property or**
19               **transactions that are the subject matter of this action.**

20           The purpose of the plaintiffs' Complaint is twofold. The first is to obtain an order requiring

21   the EPA to reopen its rulemaking on greenhouse gas emissions. The second is to obtain an order

22   enjoining BAAQMD from issuing the City an ATC allowing the City to construct the SFERP. The

23   City's significant protectable interest in opposing plaintiffs' second goal is beyond dispute.

24           As discussed above, the City has worked diligently for over four years to obtain all of the

25   permits required to construct this facility. The ATC is the last remaining entitlement, and is

26   essentially a ministerial permit. If plaintiffs were to prevail in this matter, this Court might enjoin the

27   issuance of the ATC and thereby prevent the City from proceeding with the SFERP.

28

1    The City has expended substantial sums of money both to obtain all of the permits required

2  from the CEC and BAAQMD and to enable it to begin construction of the SFERP.  The City only

3  needs the ministerial ATC to build the SFERP.  At this stage, the City clearly has a protected interest

4  in the ATC and this Court's grant of the relief requested in the Complaint could deprive the City of its

5  constitutional rights.  See *Bituminous Materials, Inc. v. Rice County*, 126 F.3d 1068, 1070 (8th Cir.

6  1997) ("the holder of a land use permit has a property interest if a state law or regulation limits the

7  issuing authority's discretion to restrict or revoke the permit by *requiring* that the permit issue upon

8  compliance with terms and conditions prescribed by statute or ordinance").  As a result, the

9  Complaint is a direct challenge to the City's interest in constructing the SFERP, which will provide

10  essential electric power in San Francisco while reducing pollution.

11    As the Ninth Circuit has held, a protectable interest under Rule 24(a) includes an interest in

12  the "remedy" sought by the plaintiff.  *United States v. City of Los Angeles*, 288 F.3d 391, 399 (9th

13  Cir. 2002); see also *Forest Conservation Council*, 66 F.3d at 1495 (internal quotation marks omitted

14  and alterations omitted) ("an applicant has a sufficient interest to intervene where the contractual

15  rights of the applicant may be affected by a proposed remedy").  The City has the right to present its

16  views to the Court on whether the plaintiffs are entitled to the remedies they seek.  *City of Los*

17  *Angeles*, 288 F.3d at 400.

18          **3.     The City is so situated that the disposition of the action may as a practical**
                    **matter impair or impede the City's ability to protect its interests.**
19
          If the Court were to enjoin BAAQMD from issuing the ATC, the City would have no ability
20
   to protect its interests in constructing the SFERP.  There are no other proceedings pending before any
21
   court or administrative body that concern the City's authority to construct the project.  All of the
22
   potential legal challenges to the City's previously obtained entitlements have been exhausted.[9]
23
          The City needs the ATC in order to commence construction of this much-needed project.  The
24
   City has a right to be heard before this Court takes any action to enjoin the SFERP based on the
25
   allegations in the Complaint.
26
   _____
27       [9]  As noted earlier, plaintiffs have filed a frivolous request that the CEC reconsider the CEC
   Order granting the City's AFC.  (Leal Dec. at ¶ 30.)
28

1        **4.    The parties to the action do not adequately represent the City's interests.**

2        The defendants and the City have different interests and objectives in defending this action.

3    Because of the vague nature of plaintiffs' allegations, especially as to BAAQMD, the City cannot

4    guess at this juncture – before any responsive pleadings have been filed – how the EPA or BAAQMD

5    will defend against plaintiffs' claims.  Suffice it to say, however, the City's interest in this proceeding

6    concerns the City's ability to proceed with the SFERP as permitted by the CEC and BAAQMD – an

7    interest that none of the parties share.

8        As the City will show if its motion to intervene is grant, the plaintiffs' allegations are not a

9    valid basis for this Court to enjoin BAAQMD from issuing a permit that the City is entitled to based

10    on existing law.  Speculation that at some time in the future BAAQMD might have to consider other

11    factors before issuing such a permit is not legal ground for injunctive relief.  Thus, the City will bring

12    a "point of view to the litigation [that might] not be presented by either the plaintiffs or the

13    defendants."  *Lockyer*, 450 F.3d at 445.

14        **B.    The Court Should Grant the City's Motion for Permissive Intervention**

15        The first issue for this Court to decide with respect to the City's motion for permissive

16    intervention is whether the City's defense and the main action have a question of law or fact in

17    common.  As the City has shown, the factual allegations in the Complaint concern the SFERP and the

18    BAAQMD permits.  The City's defenses to the Complaint concern BAAQMD's authority to issue

19    those permits under existing law unfettered by any potential new EPA rules and regulations.  For this

20    reason, the City has met the legal requirement for permissive intervention under Rule 24(b).

21        Despite the common issue of fact, this Court may deny the City's motion if it finds that

22    allowing the City to intervene will cause undue delay or prejudice the parties.  Because this action

23    was commenced on September 24, 2007, there is no basis for this Court to exercise its discretion to

24    deny the City's motion.

25        **C.    The City's Motion Complies with the Procedural Requirements of Rule 24(c)**

26        In this motion, the City has included a complete statement of the legal and factual grounds for

27    seeking to intervene.  The City has also shown that, if its motion is granting, it will respond to the

28    Complaint by failing  a motion to dismiss.

1    Thus, the City's motion satisfies the requirement that a motion to intervene be accompanied

2    by a pleading setting forth the applicant's proposed claim or defense.

3    **V.    CONCLUSION**

4    Based on the foregoing, the City respectfully requests that its motion to intervene in this

5    proceeding be granted.

6    Dated:  October 26, 2007                     DENNIS J. HERRERA
                                                    City Attorney
7                                                   OWEN J. CLEMENTS
                                                    Chief of Special Litigation
8                                                   THERESA L. MUELLER
                                                    Chief Energy and Telecommunications Deputy
9                                                   WILLIAM K. SANDERS
                                                    Deputy City Attorney
10

11

12                                            By:_____/s/_____
                                                    WILLIAM K. SANDERS
13                                                  Deputy City Attorney

14                                            Attorneys for Movant/Intervenor
                                              CITY AND COUNTY OF SAN FRANCISCO
15

16

17

18

19

20

21

22

23

24

25

26

27

28