Joshua Arce, Esq. (State Bar No. 218563)
josh@brightlinedefense.org
BRIGHTLINE DEFENSE PROJECT
240 Golden Gate Avenue, Ste. 102
San Francisco, CA  94102
415-837-0600
Fax 415-837-0660

Martin Homec (State Bar No. 085798)
martinhomec@gmail.com
P. O. Box 4471
Davis, CA 95617
530-867-1850

Attorneys for Plaintiffs
SAN FRANCISCO CHAPTER OF THE
A. PHILIP RANDOLPH INSTITUTE,
CALIFORNIANS FOR RENEWABLE ENERGY,
LYNNE BROWN, REGINA HOLLINS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO CHAPTER OF THE A. PHILIP RANDOLPH INSTITUTE, CALIFORNIANS FOR RENEWABLE ENERGY, LYNNE BROWN, REGINA HOLLINS, <br><br> on behalf of themselves, all others similarly situated, and the general public, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, STEPHEN JOHNSON, BAY AREA AIR QUALITY MANAGEMENT DISTRICT, CITY AND COUNTY OF SAN FRANCISCO, <br><br> Defendants. | Case No.:       C-07-4936-CRB <br><br> FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

- 1 -

**NATURE OF THE ACTION**

1. This case challenges two proposed fossil fuel-burning power plants to be built in and around San Francisco.

2. The first power plant would be built in a low-income, mostly minority neighborhood and is called the San Francisco Electric Reliability Project ("SFERP").  The facility would consist of three gas-fired combustion turbines assembled as a 146 megawatt simple cycle power plant to be located in between San Francisco's Bayview Hunters Point and Potrero districts.

3. The second power plant would be built near the San Francisco International Airport and is referred to as the "SFO CT."  That facility would consist of a single gas-fired combustion turbine operating as a 49 megawatt simple cycle power plant to be located on the northeast side of the airport.

4. CCSF's combustion turbine power plants (collectively called the "CT power plants") will emit large quantities of carbon dioxide and other greenhouse gases and contribute to an elevated level of greenhouse gases in the atmosphere.  Greenhouse gases trap heat in our atmosphere and contribute to global warming and climate change.

5. There is a scientific consensus that global warming has begun, is affecting our world, and will accelerate over the coming decades unless action is taken to reduce emissions of carbon dioxide and other greenhouse gases.  This consensus includes a concern that building new stationary sources of greenhouse gas emissions, such as CCSF's proposed power plants, should be heavily scrutinized in light of global warming and rejected whenever possible.

**Global Warming and the Massachusetts Case**

6. The United States Supreme Court recently issued a landmark decision on the subject of greenhouse gases and global warming in the case of Massachusetts v. EPA, 549 U.S. 1438, 1455 (April 2, 2007), affirming that "[t]he harms associated with climate change are serious and well recognized."

7. The Massachusetts case resulted from a 2003 decision of the United States Environmental Protection Agency ("EPA") that it lacked authority under the Clean Air Act to

1    regulate carbon dioxide and other greenhouse gases, and that even if the EPA did have such

2    authority it declined to implement such regulation.

3        8.    The Supreme Court, however, ruled in the <u>Massachusetts</u> case that the EPA's

4    current rationale for refusing to regulate greenhouse gases was not valid and ordered it to

5    "ground its reasons for action or inaction in the statute," referring to the Clean Air Act

6    (<u>Massachusetts</u>, at 1463).  The Court argued that "greenhouse gases fit well within the Clean Air

7    Act's capacious definition of 'air pollutant'" (<u>Massachusetts</u>, at 1462).

8        9.    Though the fact pattern in <u>Massachusetts</u> was confined to greenhouse gas

9    emissions from motor vehicles, statements from Justice Ginsburg, Chief Justice Roberts, and

10   Justice Breyer at oral argument on November 29, 2006 highlight the fact that the same

11   underlying policy will apply to emissions from power plants.

12       10.    In fact, the instant action parallels a case entitled <u>Coke Oven Environmental Task</u>

13   <u>Force v. EPA</u>, No. 06-1131 (D.C. Cir. filed Apr. 7, 2006).  The plaintiffs in <u>Coke Oven</u> similarly

14   requested a court order requiring the EPA to regulate greenhouse gas emissions from power

15   plants.  Defendants challenged plaintiffs' standing to sue in light of the fact that the EPA does

16   not currently regulate greenhouse gas emissions from any source.  The Court of Appeals,

17   however, stayed defendant's challenge pending the outcome of the <u>Massachusetts</u> case.

18       11.    The court subsequently found that the <u>Massachusetts</u> ruling gave the <u>Coke Oven</u>

19   plaintiffs standing to proceed with their EPA challenge, just as <u>Massachusetts</u> gives standing to

20   plaintiffs in the instant lawsuit to proceed with their challenge.

21   **EPA Has Failed to Act**

22       12.    Despite the urging of citizens and activists from around the country, the EPA has

23   still neither re-assessed its refusal to regulate greenhouse gases nor accepted the logic stressed by

24   the Supreme Court:  that greenhouse gases must be regulated.

25       13.    One of the primary purposes of this lawsuit is to obtain an order mandating that

26   the EPA's Administrator Stephen Johnson ("Johnson") must comply with the <u>Massachusetts</u>

27   <u>ruling</u> because the undeniable result will be that he will make an "endangerment finding," that

28

greenhouse gases "in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."

14.    That endangerment finding will then require the EPA to regulate greenhouse gas emissions from motor vehicles under Section 202 of the Clean Air Act.  Even more important for the instant plaintiffs, however, is the fact that the endangerment finding will similarly require the EPA to promulgate new regulations for stationary sources under Section 111 of the Clean Air Act and new national ambient air quality standards to be implemented by the states under Sections 108 to 110 of the Clean Air Act.

15.    The new rules to be promulgated under Section 111 and Sections 108 to 110 will apply to power plants, including CCSF's CT power plants.

**The BAAQMD Must Be Enjoined Until the EPA Complies**

16.    The Bay Area Air Quality Management District ("BAAQMD") is a defendant in this action because the EPA has delegated to the BAAQMD implementation of the provisions of Clean Air Act new source review in regard to one of CCSF's proposed CT power plants, the SFERP, designated BAAQMD Application Number 12344.

17.    CCSF has requested that the BAAQMD issue "Authority to Construct" its proposed power plant under BAAQMD Regulation 2, Rule 3, Section 301.

18.    A second purpose of this lawsuit is to request that the Court prohibit the BAAQMD's issuance of Authority to Construct CCSF's SFERP power plant in order to prevent irreparable harm to plaintiffs.

19.    As the EPA's delegate for Clean Air Act implementation, the BAAQMD will be responsible to enforce a brand new set of greenhouse regulations following Johnson and the EPA's endangerment finding.

20.    The BAAQMD's own definition of "regulated air pollutants" and resulting Rules and Regulations are dictated by the EPA's definition, and will include greenhouse gases such as carbon dioxide upon defendant Johnson's endangerment finding.  All power plants emitting more than 100 tons per year of a regulated air pollutant must obtain a Prevention of Significant

Deterioration ("PSD") permit under BAAQMD Regulation 2, Rule 6 and Title V of the Clean Air Act.

21.    The BAAQMD has not required CCSF to apply for a PSD permit, nor has the BAAQMD conducted the extensive review required to obtain a PSD permit, because CCSF's SFERP plant does not emit more than 100 tons per year of an air pollutant regulated today.

22.    No agency has conducted an analysis of either of CCSF's CT power plants' greenhouse gas emissions but the plants should be expected to produce between 4,000 and 5,000 pounds of carbon dioxide per megawatt-hour and between 325,000 and 450,000 <u>tons</u> of carbon dioxide per year.  The power plants' contribution of carbon dioxide and heat will be disproportionately high relative to their output, because their simple cycle configuration means they are only 30% efficient.

23.    The BAAQMD must be enjoined from issuing Authority to Construct CCSF's power plant because CCSF will be required to obtain a PSD permit, and undergo a new form of EPA or BAAQMD new source review, once the EPA complies with the <u>Massachusetts</u> ruling, as a perquisite to building its SFERP power plant.  If the BAAQMD issues Authority to Construct prior to the EPA's ruling and promulgation of new EPA and BAAQMD rules and regulations, plaintiffs will forever be denied the benefit designed to protect citizens and the environment from global warming and the effects of ground-level greenhouse gases afforded future proposed power plants.

**CCSF Has Deprived Plaintiffs of Their Constitutional Rights**

24.    As a further cause of action and component of plaintiff's prayer for relief, the plaintiffs request that the Court enjoin CCSF from requesting the BAAQMD's approval of its permit application and from building both of its proposed CT power plants.

25.    By denying the affected plaintiffs, and indeed the community at large, the opportunity to meet San Francisco's energy needs without a power plant to be sited amongst its most disadvantaged citizens, CCSF has deprived plaintiffs of their constitutional rights while acting under color of state law, in violation of 42 U.S.C. section 1983.

26.     CCSF has denied plaintiffs their constitutional rights by misrepresenting the stated benefits of its proposed SFERP power plant and refusing to disclose information critical to informed public participation in the procedural process leading to approval of the plant, resulting in at least one year of lost opportunity to meet the power plants' stated goals without construction of new fossil fuel-burning power plants.

27.     Plaintiffs' requested remedies are available only before Authority to Construct CCSF's SFERP power plant is issued and before construction of the SFO CT is commenced.

28.     Plaintiffs have thoroughly exhausted their administrative remedies.

## JURISDICTION AND VENUE

29.     This action arises under 28 U.S.C. § 1361, this being an action in the nature of mandamus to compel an officer or employee of the United States or an agency of the United States to perform a duty owed to plaintiffs.

30.     This action arises under 5 U.S.C. §§ 701 to 706, this being an action brought by persons suffering legal wrongs because of agency action unlawfully withheld and unreasonably delayed, pursuant to the Administrative Procedure Act.

31.     This action seeks an order requiring the Administrator of the EPA ("the Administrator") to make a timely determination whether greenhouse gases may reasonably be anticipated to endanger public health or welfare, and are thus a class of pollutants that are required to be regulated under the Clean Air Act, 42 U.S.C § 7401 et seq.

32.     This action seeks an order requiring the Administrator, upon his affirmative decision that greenhouse gases constitute a class of pollutants that are required to be regulated under the Clean Air Act, to promulgate regulations for greenhouse gasses in a timely manner.

33.     This action arises under 42 U.S.C. §§ 1981 to 1988 as an action brought by persons of protected civil rights status being deprived constitutional rights by CCSF under color of law.

34.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

35.    Venue lies in the Northern District of California pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to this case occurred in this District, because defendants BAAQMD and CCSF reside in this District.

36.    Venue is proper in the Northern District of California pursuant to § 304(c) of the Clean Air Act, 42 U.S.C. § 7604(c), because BAAQMD and CCSF reside in this District and the stationary sources of greenhouse gases at issue in this case are located in this District.

## PARTIES

37.    Plaintiff San Francisco Chapter of the A. Philip Randolph Institute ("APRI") is a non-profit community-based organization with a mission to fight for racial equality and economic justice.  Its role is unique in that in representing and working with African-American workers, it serves as a link between labor and the black community.  APRI's constituents live within the vicinity of the proposed SFERP power plant location and workers who are members of APRI will work across the street from the proposed power plant site.  Thus, APRI's members would have standing to bring this action in their own right, though neither the claims asserted nor the relief requested require the participation of APRI's individual members in this lawsuit.

38.    Plaintiff CAlifornians for Renewable Energy "(CARE") is a non-profit public benefit corporation organized and operating under the laws of California for the primary purpose of educating the public about, and encouraging public agencies to consider, alternative forms of renewable energy as a means of avoiding dependence on declining fossil fuel supplies, and the harmful air emissions caused by their use.  In this action CARE seeks to prevent global warming and investment in and dependence on fossil fuel-burning technology in favor of renewable energy, interests which are germane to CARE's purpose.  In fact, CARE has challenged the proposed SFERP in other administrative proceedings on the grounds of its disproportionate impact on low-income people of color and because of its effect in continuing dependence on fossil fuel-burning technology that increases global warming.  It is reasonably probable that CCSF's construction of its power plants prior to the introduction of new greenhouse gas regulations from the EPA will threaten CARE's concrete interests.  CARE's members are mostly low-income people of color, the people living in the areas most affected by proposed power

1  plant.  CARE's members have concerns that will cause them injury due to global warming and

2  from emissions to be distributed from CCSF's proposed power plants due to their daily

3  proximity to the site.  CARE's members thus would have standing to bring this action in their

4  own right.  However, neither the claims asserted nor the relief requested require the participation

5  of CARE's individual members in this lawsuit.

6      39.    Plaintiff Lynne Brown ("Brown") is a community activist and resident of

7  Bayview Hunters Point.  As a resident of that neighborhood he will be directly affected by air

8  pollutants discharged by the SFERP power plant, as the San Francisco Public Utilities

9  Commission's pollution distribution study shows that the majority of the plant's emissions will

10 be distributed amongst the Bayview Hunters Point and Potrero communities.  Brown will be

11 damaged by the CCSF CT power plants' contribution to global warming through their

12 greenhouse gas emissions and has been damaged by CCSF's deprivation of the rights of those

13 impacted to live without a fossil fuel-burning power plant in their community.  Since 2003

14 Brown has continuously lodged his objections to the proposed CCSF power plants, both on the

15 basis of his status as resident affected by its pollutants and in his capacity as Vice-President of

16 CAlifornians for Renewable Energy.

17     40.    Plaintiff Regina Hollins ("Hollins") is a community activist and resident of

18 Potrero.  As a resident of that neighborhood she will be directly affected by air pollutants

19 discharged by the SFERP power plant, as the San Francisco Public Utilities Commission's

20 pollution distribution study shows that the majority of the plant's emissions will be distributed

21 amongst the Bayview Hunters Point and Potrero communities.  Hollins will be damaged by the

22 CCSF CT power plants' contribution to global warming through their greenhouse gas emissions

23 and has been damaged by CCSF's deprivation of the rights of those impacted to live without a

24 fossil fuel-burning power plant in their community.    Since 2003, Hollins has regularly

25 registered her disapproval of the proposed CCSF power plant as yet another project in which her

26 community bears the sole burden of a city-wide benefit.

27     41.    Plaintiffs are and will be affected adversely by the EPA, the BAAQMD, and

28 CCSF permitting the construction of CCSF's power plants in the absence of new greenhouse gas

- 8 -

1    regulations to be set forth by EPA.  If the BAAQMD issues Authority to Construct the SFERP

2    before the EPA has complied with the Supreme Court's directive in <u>Massachusetts</u>, CCSF will

3    begin to build its power plants and plaintiffs will be denied the benefit of rules which will

4    operate to force CCSF to build power plants that are less harmful to the affected plaintiffs or to

5    build no power plants at all.  These new regulations and the renewed, fully-informed public

6    debate requested herein will lead to mitigation of the deleterious effects of greenhouse gases on

7    plaintiffs, in particular global warming and ground-level ozone, or will convince CCSF to

8    abandon the CT power plant projects altogether.

9        42.    Defendant United States Environmental Protection Agency ("EPA") was

10    established in the executive branch as an independent agency pursuant to Reorganization Plan

11    No. 3 of 1970 (5 U.S.C. app.), effective December 2, 1970.  The EPA is an agency within the

12    meaning of 5 U.S.C. § 522(f) and is responsible for the administration and enforcement of the

13    Clean Air Act.

14        43.    Defendant Stephen Johnson ("Johnson") is the Administrator of the EPA, and is

15    being sued in his official capacity.  The Administrator has the statutory authority to administer

16    the Clean Air Act.

17        44.    Defendant Johnson, as the Administrator of the EPA, is obligated to carry out the

18    directives of the United States Supreme Court.

19        45.    Defendants Johnson and EPA are referred to collectively herein as the "EPA

20    Defendants."

21        46.    Defendant Bay Area Air Quality Management District ("BAAQMD") is, by

22    statute, a public agency of the state of California.  The BAAQMD is the agency responsible for

23    the adoption and enforcement of certain rules to attain and maintain the air quality standards set

24    under the Clean Air Act in the Bay Area, which includes CCSF.  In regard to the proposed

25    SFERP, the EPA has delegated to the BAAQMD responsibility for administering the federal

26    New Source Review program and the BAAQMD incorporates the EPA's roster of regulated air

27    pollutants in implementing its own new source and power plant permit review procedures.  Once

28    the EPA makes an endangerment finding as prompted in this complaint, the BAAQMD will

1    necessary be required to include greenhouse gases such as carbon dioxide in its definition of

2    regulated air pollutants.

3        47.    Defendant City and County of San Francisco "CCSF" is a municipal corporation

4    within the State of California.

5                                   **BACKGROUND STORY**

6        48.    In 2004 CCSF adopted a plan to provide reliability to the city's electrical grid

7    without two older power plants located within city limits:  the Hunters Point Power Plant and the

8    Potrero Power Plant.

9        49.    That plan, called the 2004 San Francisco Action Plan, was submitted to the

10   California Independent System Operator, the non-profit corporation charged with maintaining

11   reliability of California's electrical grid, and led to the closure of the Hunters Point Power Plant.

12       50.    However, the plan now calls for the Potero Power Plant to be replaced with the

13   equally undesirable SFERP and SFO CT power plants.

14       51.    In light of widespread concern over San Francisco's contribution to global

15   warming and other issues raised in this complaint it is clear that CCSF needs to replace its 2004

16   San Francisco Action Plan with a 2008 San Francisco Action Plan that incorporates the wide-

17   spread understanding that cities should not be building fossil fuel-burning power plants in 2008,

18   especially amongst their disadvantaged neighborhoods.

19       52.    The United States Supreme Court's ruling in the <u>Massachusetts</u> case signifies a

20   sea change in terms of how our society now views the cumulative effect of greenhouse gas

21   emissions on the environment.  Municipalities must view the creation of new fossil fuel-burning

22   power plants in light of growing concern regarding global warming and new EPA regulations to

23   be promulgated in order to curb climate change.

24       53.    The 2004 San Francisco Action Plan contemplates that "any significant change to

25   the assumptions underlying [its] analysis may change [its] conclusions."

26       54.    Numerous changes to the assumptions underlying CCSF CT power plant proposal

27   have occurred since 2004 which undercut the supposed benefit of building them, culminating in

28

FIRST AMENDED COMPLAINT
C-07-4936-CRB

1  the fact that EPA has been ordered to regulate greenhouse gas emissions as regulated air

2  pollutants under the Clean Air Act.

3       55.    For example, San Francisco will build 104 megawatts of distributed generation

4  within city limits over the next three years, including 31 megawatts of solar photovoltaic power.

5  The city recently announced an ambitious incentive program that will encourage the

6  development of 50 megawatts of solar generation on San Francisco rooftops.

7       56.    San Francisco in 2007 approved a project called the Trans Bay Cable that will

8  bring 400 megawatts of pollution-free power to the city in the first quarter of 2010.

9       57.    CCSF also plans to derive over 100 megawatts from conservation and energy

10  efficiency technologies over the next three years, and upgrades to San Francisco's transmission

11  lines will complete the key to electric reliability in San Francisco.

12       58.    That San Francisco today requires 960 megawatts of electricity and has created

13  pollution-free programs to increase its generation and capacity by over 650 megawatts means

14  that CCSF must revisit its 2004 plan to build 194 megawatts of fossil fuel-burning combustion

15  turbines.

16       59.    CCSF must create a 2008 San Francisco Action Plan that meets the goals

17  articulated in 2004, but without the construction of greenhouse gas-producing power plants, in its

18  most historically burdened and polluted neighborhood, that will not receive the benefit of new

19  Clean Air Act regulations to be promulgated by the EPA.

20  **STATUTORY SCHEME**

21       60.    The Clean Air Act is a comprehensive program for controlling and improving the

22  nation's air quality.  Under the Clean Air Act, the EPA identifies air pollutants that endanger the

23  public health or welfare, determines what concentrations of those pollutants are safe, and

24  promulgates those determinations as national ambient air quality standards.  See 42 U.S.C. §§

25  7408, 7409.  Each state bears responsibility for ensuring that its ambient air meets the

26  appropriate NAAQS.  See 42 U.S.C. § 7407(a).

27       61.    Section 202 of the Clean Air Act establishes emissions standards for "new motor

28  vehicles or new motor vehicle engines.  Section 202 requires the Administrator to identify

sources of emissions "which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."  The Administrator is then mandated to prescribe standards applicable to the emission of such endangering air pollutants from motor vehicles.

62.     Section 111 of the Clean Air Act establishes emissions standards for "stationary sources," defined as any building, structure, facility, or installation "which emits or may emit any air pollutant."  Similar to Section 202, Section 111 also requires the Administrator to identify sources of emissions "which may reasonably be anticipated to endanger public health or welfare."  The Administrator is similarly mandated by Section 111 to regulate such emissions from "significant" sources such as power plants.

63.     The Supreme Court stated in the <u>Massachusetts</u> case that "under the clear terms of the Clean Air Act, EPA can avoid taking further action only if it determines that greenhouse gases do not contribute to climate change or if it provides some reasonable explanation as to why it cannot or will or will not exercise its discretion to determine whether they do" (<u>Massachusetts</u>, 127 S. Ct. at 1462).

64.     In other words, the EPA defendants' compliance with the Supreme Court's <u>Massachusetts</u> order as urged in this lawsuit means that the statutory scheme of pollutants regulated under the Clean Air Act will necessarily change.

65.     Section 108 of the Clean Air Act requires the Administrator to create a list of criteria air pollutants that "may reasonably be anticipated to endanger public health or welfare."  If carbon dioxide and other greenhouse gases meet the requirements of Section 202, such emissions will have to be regulated under Section 108.

66.     Once a pollutant is listed under Section 108, the EPA is required under Section 109 to establish National Ambient Air Quality Standards for the pollutant.  Section 110 requires states to develop State Implementation Plans for metropolitan areas to meet the standard.

67.     It is clear that once the EPA Defendants comply with the Supreme Court's order in <u>Massachusetts</u> the entire scheme of review of new sources of greenhouse gases in our country, such as CCSF's power plants, will change forever.

68.     The Clean Air Act requires the proponent of any new major stationary sources of air pollution to obtain a construction permit before commencing construction.  42 U.S.C § 7411. This review process, known as New Source Review was delegated to the BAAQMD in regard to the SFERP power plant, Application Number 12344.  BAAQMD has its own new source review provisions in place in BAAQMD Regulation 2, Rules 2 and 3 and Regulation 10 which are linked to the provisions and list of regulated pollutants found in the Clean Air Act.

69.     Regulations to be promulgated by the EPA may bring the SFERP into the definition of a "Major Facility" as that term is used by the BAAQMD in Regulation 2, Rule 6, Section 212.  The BAAQMD follows the EPA definition of a "Major Facility" as a facility that "has the potential to emit 10 tons per year or more of a single hazardous air pollutant, 25 tons per year or more of a combination of hazardous air pollutants, or such lesser quantity as the EPA Administrator may establish by rule."

70.     If the SFERP's level of carbon dioxide and greenhouse gas emissions rise to that of a post-<u>Massachusetts</u> "Major Facility," the SFERP becomes subject to "Major Facility Review" under BAAQMD Regulation 2, Rule 6, Section 213 including Title V of the Clean Air Act and Prevention of Significant Deterioration ("PSD") analysis.

71.     PSD process is designed, according to the EPA, to "protect public health and welfare" and "assure that any decision to permit increased air pollution…is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation."

72.     Having issued Final Determination of Compliance in regard to the SFERP plant on approximately February 25, 2006, BAAQMD is able to issue "Authority to Construct" the SFERP plant under BAAQMD Regulation 2, Rule 3, Section 301.

73.     Plaintiffs, however, request that this Court stay further the issuance of BAAQMD Authority to Construct the SFERP and CCSF's construction of the power plants until the EPA has complied with the court's rule in the <u>Massachusetts</u> case, because nearly every statute cited within this statutory scheme will change and possibly change drastically.  CCSF's power plant proposal will require amendment to comply with new EPA and BAAQMD standards, and neither

the EPA, the BAAQMD, or CCSF have ordered an analysis of, or raised in any public forum, the contribution of the power plants to global warming or the effect of their greenhouse gases at the ground-level.

## THE CT POWER PLANTS' ENVIRONMENTAL IMPACTS

74.     The SFERP would be located on a 4-acre parcel owned by the City and County of San Francisco and located south of 25th Street and approximately 900 feet east of Illinois Street.

75.     The nearest residence to the SFERP is located approximately 1,600 feet west of the site. There are over 500 sensitive receptors including 233 schools and day care facilities, 15 hospitals, 32 senior care facilities, 221 churches, and 57 parks and recreation centers within a 3-mile radius. There also appear to be some transient residents at Warm Water Cove Park located about 700 feet northeast of the project site. The closest church is located just 474 feet southwest of the project site.

76.     The SFERP plant will emit up to a total of 39.7 tons of nitrogen oxides, 27.9 tons of carbon monoxide, 7.7 tons of precursor organic compounds, 18 tons of particulate matter, and 2.7 tons of sulfur dioxide into the community per year, according to BAAQMD.

77.     Nitrogen oxides contribute to the formation of ground-level ozone and atmospheric particles. Carbon monoxide also contributes to smog. Particulate matter reduces visibility and makes bodies of water more acidic and disrupts nutrient balance. Sulfur dioxide too reduces visibility and contributes to acid rain and building decay.

78.     The SFO CT power plant will be sited on the north side of San Francisco International Airport, near the United Cogeneration Facility.

79.     Emissions data of the SFO CT power plant are not available to the public, because as a facility of less than 50 megawatts, the SFO CT plant is not subject to the extensive regulation and review undertaken in regard to the SFERP plant. A general assumption is that the SFO CT plant will produce emissions at a level one-third that of the SFERP if it is run for the same duration, and more if it runs the permitted number of hours of 4900 per year.

80.     As discussed above, no agency has conducted an analysis of the greenhouse gas emissions of either CCSF power plant, but the plants' carbon dioxide and heat emissions will be significant, especially so in light of the fact that they are only 30% efficient.

81.     Greenhouse gas emissions contribute to global warming, meaning that the threatened injuries to the plaintiffs and affected residents from continued global include beach erosion, inundation of coastal land, and salinization of water supplies from accelerated sea level rise; reduction of the mountain snow pack in California that provides a critical source of water for the State; lowered Great Lakes water levels, which impairs commercial shipping, recreational harbors and marinas, and hydropower generation; more droughts and floods, resulting in property damage and hazard to human safety; and widespread loss of species and biodiversity.

82.      In the absence of reductions of carbon dioxide emissions, global warming will accelerate.  Global average surface air temperature is projected to warm 2.5 to 10.4 degrees Fahrenheit from 1990 levels by 2100, depending upon the level of greenhouse gas emissions and the response of the planet to the increasing buildup of greenhouse gases.  By comparison, at the depths of the last ice age 20,000 years ago the average global temperature of the Earth was only seven to eleven degrees Fahrenheit cooler than today.

83.     The level and rate of global warming over the next several decades and beyond depends upon the level of greenhouse gas emissions and in particular upon the level of carbon dioxide emissions from the combustion of fossil fuels.  Thus, the harmful consequences of global warming can be avoided or mitigated by reducing such emissions.

### THE CT POWER PLANTS' HEALTH EFFECTS

84.     Health risks from nitrogen oxides include respiratory effects and lung tissue damage.  Carbon monoxide carries cardiovascular and central nervous system effects. Particulate matter decreases lung function, aggravates asthma and produces other respiratory effects, as does sulfur dioxide.

85.     Greenhouse gases, in addition to a long term increase in suffering from asthma and other respiratory diseases due to global warming and increased heat deaths due to intensified

- 15 -

and prolonged heat waves, also poses a specialized kind of health risk for plaintiff APRI, whose constituent members will work across the street from the SFERP power plant.

86.    The SFERP power plant will emit low-level ozone that due to its eighty-five foot stack, which is less than a third of the height of the Potrero plant's two hundred eighty-foot stack.  Those emissions will affect APRI in a different manner than other plaintiffs due to the fact that its constituent members work across the street from the SFERP.

87.    Ground-level ozone is the primary constituent of smog and breathing ozone can trigger a variety of health problems including chest pain, coughing, throat irritation, and congestion.  It can worsen bronchitis, emphysema, and asthma.

88.    Ground-level ozone also can reduce lung function and inflame the linings of the lungs.  Repeated exposure may permanently scar lung tissue.

89.    The Clean Air Act requires the EPA to set air quality standards to protect both public health and the public welfare.  This is the rationale behind the Supreme Court's holding in the Massachusetts case and a compelling reason for this Court to enjoin the SFERP power plant until the EPA dictates changes to the Clean Air Act that municipalities like CCSF can follow.

## FIRST CLAIM FOR RELIEF

### For Mandamus Relief

### As to EPA Defendants, BAAQMD, and CCSF

90.    Plaintiffs adopt and incorporate by reference Paragraphs 1-89 of this Complaint.

91.    On April 2, 2007 the United States Supreme Court ordered the EPA to "ground its reasons for action or inaction in the [Clean Air Act]" (Massachusetts v. EPA, 127 S. Ct. at 1463).

92.    To date the EPA defendants have not performed a duty owed to plaintiffs:  to comply with the order of the Supreme Court in order to slow global warming and to promulgate rules that will lessen the environmental and health impacts of fossil fuel-burning power plants such as CCSF's CT plants.

93.    The United States Supreme Court in Massachusetts stated that there is no reasonable grounds for the EPA defendants to continue to refuse to regulate greenhouse gases

because greenhouse gases "fit well within the Clean Air Act's capacious definition of 'air pollutant" (Massachusetts, at 1462).

94.    In other words, once the EPA defendants are ordered to perform the aforementioned duty to plaintiff, Johnson will determine that greenhouse gases "in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."

95.    The aforementioned endangerment finding will thus require the EPA to regulate greenhouse gases under the Clean Air Act Section 202, in regard to motor vehicles, and under Section 111, in regard to stationary sources such as CCSF's power plant.  The EPA must then promulgate new National Ambient Air Quality Standards for greenhouse gases that the states must implement, pursuant to Clean Air Act Sections 108 to 110.

96.    As a result of EPA's failure to comply with the Supreme Court's order, plaintiffs are poised to receive in and around their neighborhood power plants that have not received even a cursory analysis of their greenhouse gas emission levels, their contribution to global warming and resulting impact, or the ground-level environmental and health impacts of their greenhouse gas emissions on the community.

97.    If the EPA defendants do not perform their duty owed to plaintiffs, plaintiffs will be irreparably injured because CCSF will construct its power plants without the benefit of new regulations to be promulgated by the EPA in order to lessen the environmental and health impacts of fossil fuel-burning power plants, regulations which will prompt a true public debate on whether or not municipalities should even be building power plants like CCSF's CT plants.

98.    BAAQMD is an indispensable party in plaintiffs' claim for relief because it is the EPA's delegate for implementation of the Clean Air Act, because its own Rules and Regulations are derived from the provisions and list of regulated air pollutants found in the Clean Air Act as it will be modified post-EPA compliance with Massachussetts, and because once it issues Authority to Construct the SFERP power plant CCSF will commence construction of the plant and deny plaintiffs' their only remedy for preventing the harm herein alleged.

99.    CCSF is an indispensable party in plaintiffs' claim for relief because it needs no further regulatory approval to commence construction of the SFO CT power plant and once it commences construction of the plant it will deny plaintiffs' their only remedy for preventing the harm herein alleged.

100.    Plaintiffs have no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**

**For Relief under the Administrative Procedure Act**

**As to EPA Defendants and BAAQMD**

101.    Plaintiffs adopt and incorporate by reference Paragraphs 1-100 of this complaint.

102.    EPA defendants' failure to comply with the United States Supreme Court's order in the Massachusetts case constitutes agency action unlawfully withheld as well as unreasonably delayed in violation of the Administrative Procedure Act, 5 U.S.C. § 706(1).

103.    As a result of EPA's refusal to either justify its continued failure to regulate greenhouse gases or, in lieu of such justification, regulate greenhouse gases because they "fit well within the Clean Air Act's capacious definition of 'air pollutant'" (Massachusetts, at 1462), plaintiffs are poised to be burdened by two power plants to be built in and around their neighborhood that have not received even a cursory analysis of their greenhouse gas emission levels, their contribution to global warming and resulting impact, or the ground-level environmental and health impacts of their greenhouse gas emissions on the community.

104.    Once Johnson makes the aforementioned endangerment finding EPA will be required to regulate greenhouse gases under the Clean Air Act Section 202, in regard to motor vehicles, and under Section 111, in regard to stationary sources such as CCSF's power plant. The EPA will also promulgate new National Ambient Air Quality Standards for greenhouse gases to be implemented by the states under Sections 108 to 110.

105.    If the EPA defendants do not perform their duty owed to plaintiffs, plaintiffs will be irreparably injured because CCSF will construct its power plants without the benefit of new regulations to be promulgated by the EPA in order to lessen the environmental and health

impacts of fossil fuel-burning power plants, regulations which will prompt a true public debate on whether or not municipalities should even be building power plants like CCSF's CT plants.

106.    BAAQMD is an indispensable party in plaintiffs' claim for relief because it is the EPA's delegate for implementation of the Clean Air Act, because its own Rules and Regulations are derived from the provisions and list of regulated air pollutants found in the Clean Air Act as it will be modified post-EPA compliance with <u>Massachusetts</u>, and because once it issues Authority to Construct the SFERP power plant CCSF will commence construction of the plant and deny plaintiffs' their only remedy for preventing the harm herein alleged.

107.    CCSF is an indispensable party in plaintiffs' claim for relief because it needs no further regulatory approval to commence construction of the SFO CT power plant and once it commences construction of the plant it will deny plaintiffs' their only remedy for preventing the harm herein alleged.

108.    Plaintiffs have no adequate remedy at law.

**THIRD CLAIM FOR RELIEF**

**Public Nuisance Under California Law**

**As to CCSF and BAAQMD**

109.    Plaintiffs adopt and incorporate by reference Paragraphs 1-108 of this complaint.

110.    CCSF's proposed power plants are injurious to plaintiffs' health and to the health of the public in general, and interfere with plaintiffs' comfortable enjoyment of life and property.

111.    CCSF's proposed power plants are injurious because they have not received even a cursory analysis of their greenhouse gas emission levels, their contribution to global warming and resulting impact, or their ground-level environmental and health impacts of its greenhouse gas emissions on the community.

112.    In addition, because CCSF will not own or control its power plants for at least the first thirteen years of their operation there is a very real danger that the SFERP power plant will be more destructive toward the environment and the health of the affected community than the older power plant it is designed to replace.

113.    Plaintiff APRI will be specially injured by the SFERP power plant because its constituent members will work literally across the street from the SFERP, and thus be damaged by ground-level greenhouse gases that will not affect other members of the community.

114.    Plaintiffs' fear of future injury is well founded for the following reasons:  the impact of ground-level greenhouse gases such as ozone are well-documented by the World Health Organization and the environmental science community as causing respiratory problems for those directly exposed to the degree that APRI's constituent members will be exposed when they work across the street from the SFERP power plant and its low emissions stack, and for those low-income people of color represented by CARE.

115.    The manner in which CCSF seeks to build and operate its power plants constitutes a nuisance, consisting of building the SFERP across from a location where APRI's constituent members will work, placing a disproportionate impact on low-income people of color represented by CARE, and misrepresenting the merits of its power plants as alleged below and without pause to allow the plants to receive the benefit of the EPA's new greenhouse gas regulations.

116.    It is necessary to enjoin CCSF from requesting and receiving BAAQMD Authority to Construct its SFERP power plant because CCSF's determination to construct the power plant before the EPA complies with the Massachusetts case, and before meaningful public debate on its proposed power plant can occur, means that preventing the CCSF from requesting Authority to Construct the plant is the only means by which to prevent the injury herein described.

117.    BAAQMD is an indispensable party in plaintiffs' request to enjoin issuance of Authority to Construct the SFERP power plant because CCSF's determination to construct the SFERP power plant means that as soon as CCSF receives Authority to Construct the plant from BAAQMD it will commence construction and deny plaintiffs the relief requested.

118.    Unless CCSF is enjoined from commencing construction of its power plant, the injury herein described is reasonably probable and even certain unless enjoined by the Court.

119.    Plaintiffs have no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

### Violation of 42 U.S.C 1983 – Right to Procedural Due Process

### As to CCSF

120.    Plaintiffs adopt and incorporate by reference Paragraphs 1-119 of this complaint.

121.    The United States Constitution guarantees to plaintiffs the rights to liberty and property.

122.    In addition, the California Constitution guarantees to plaintiff the right to enjoy life, to possess and protect property, and to pursue and obtain safety.

123.    The aforementioned guarantees are state and federal rights that must not be denied without due process of law pursuant to the Fourteenth Amendment of the United States Constitution.

124.    CCSF's proposed CT power plants are an infringement upon plaintiffs' rights as asserted herein in that the plants will increase global warming, discharge pollution into plaintiff's neighborhoods, diminish the value of plaintiffs' property, and decrease plaintiffs' quality of life. Therefore, these rights must not be deprived without due process of law.

125.    CCSF has delegated to its San Francisco Public Utilities Commission ("SFPUC") and SFPUC General Manager Susan Leal (the "General Manager") the duty of developing and implementing City policies to promote clean, reliable, and reasonably-priced electricity for the resident and business of San Francisco.

126.    The General Manager and her SFPUC staff have therefore been delegated final policymaking authority in regard to energy policy in San Francisco and their acts may fairly be said to represent official policy.

127.    Since the inception of CCSF's plan to build its SFERP and SFO CT power plants, the General Manager and her SFPUC staff have failed to disclose to the public fundamental flaws in the city's CT power plant proposal and misrepresented facts in an effort to prevent resistance to and rejection of the power plants.

128.    Plaintiffs learned on October 23, 2007 that the General Manager and her SFPUC staff have failed to inform the public that the 2004 San Francisco Action Plan's goal of closing

the old Potrero power plant has been nearly totally accomplished by a December 2006 change in BAAQMD's rules regarding gas turbines, misrepresented that the SFERP power plant offers health benefits over the old Potrero power plant when it presents a "similar health concern" according to the BAAQMD, and declined to participate in 2006 proceedings with the BAAQMD that could have led to shut down of the old Potrero power plant without the construction of new fossil fuel-burning power plants.

129.    When BAAQMD Air Quality Engineering Manager Barry Young announced these facts in testimony before the SFPUC on October 23, rather than continue public discussion of this new information the General Manager dispatched a member of her staff to take Mr. Young's microphone from him.  In fact the SFPUC continued to misrepresent the merits of its CT power plants until cautioned against doing so by CCSF's city attorney.

130.    In addition, the SFPUC staff have for many years indicated to the public that the California Independent System Operator ("CAISO") requires a power plant in San Francisco, but plaintiffs recently learned that in private emails the SFPUC indicate to one another that "CAISO is requiring generation on the SF peninsula" (emphasis added).

131.    In addition, the General Manager and her staff refuse to conduct an analysis of the CT power plants' impact on global warming or allow the power plant projects to receive the benefit of new rules to be promulgated by the EPA and the BAAQMD.

132.    Plaintiffs have been denied at least one year of fully informed public participation regarding the CT power plants that would have been a very different debate had the General Manager and her staff indicated that the December 2006 BAAQMD rule change means that the new power plants offer no improvement over the old plants, that the new power plants emit more greenhouse gases than the old plants according to the BAAQMD, or that the CAISO actually does not require a power plant in the city's most disadvantaged neighborhood.

133.    Plaintiffs stand to be deprived of their constitutional rights as herein alleged due to the General Manager and her staff's misrepresentations and failure to disclose facts that would have discouraged public and legislative support for CCSF's CT power plants.

FIRST AMENDED COMPLAINT
C-07-4936-CRB

134.   CCSF provides no pre-deprivation due process which the Constitution requires under these circumstances and plaintiffs stand to have their constitutional rights deprived in the absence of due process of law by the General Manager and her staff's actions under the color of law.

135.   Plaintiffs have no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF

### Mandamus Under California Law

### As to CCSF

136.   Plaintiffs adopt and incorporate by reference Paragraphs 1-135 of this complaint.

137.   Plaintiffs have no plain, speedy, and adequate alternative remedy to prevent the damage caused by CCSF building its power plants under the circumstances outlined herein.

138.   In 2003 CCSF adopted a Precautionary Principle, codified in the San Francisco Environment Code, Chapter 1, to protect its citizens' "equal right to a healthy and safe environment."

139.   The CCSF Precautionary Principle begins at Section 101: "The following shall constitute the City and County of San Francisco's Precautionary Principle policy. All officers, boards, commissions, and departments of the City and County shall implement the Precautionary Principle in conducting the City and County's affairs."

140.   The CCSF continues to state: "The Precautionary Principle requires a thorough exploration and a careful analysis of a wide range of alternatives. Using the best available science, the Precautionary Principle requires the selection of the alternative that presents the least potential threat to human health and the City's natural systems. Public participation and an open and transparent decision making process are critical to finding and selecting alternatives."

141.   The Precautionary Principle constitutes a clear, present, and ministerial duty required of CCSF and its officers, boards and commissions to perform.

142.   Plaintiffs have a clear, present, and beneficial right to CCSF performance under the Precautionary Principle, and the issues herein presented and relief herein requested are matters of great public importance that must be resolved promptly.

- 23 -

143. Plaintiffs have no adequate remedy at law but for the Court to order that CCSF and its officers, boards, and commissions adhere to the Precautionary Principle and perform the actions requested in plaintiffs' prayer for relief.

144. Plaintiffs' herein requested claims for relief and remedies will in no way impact San Francisco's electric reliability as it exists today, nor will they affect the availability of reliable electricity to plaintiffs or any other member of the public.

WHEREFORE, Plaintiffs request that this Court:

UNDER THE FIRST AND SECOND CLAIMS FOR RELIEF

1. Declare that the EPA and Johnson must respond to the United State Supreme Court's demand in Massachusetts v. EPA to ground the EPA's action or inaction in the Clean Air Act;

2. Declare that in the likely event that the EPA and Johnson make an endangerment finding in regard to motor vehicles under Section 202 of the Clean Air Act the same endangerment finding will apply to Section 111 regarding stationary sources, Section 108 regarding criteria pollutants, Section 109 regarding National Ambient Air Quality Standards (NAAQS), and Section 110 regarding State Implementation Plans.

3. Grant an order enjoining the BAAQMD from taking further action with respect to Authority to Construct the SFERP power plant, Application Number 12344, until such time as the EPA defendants have complied with the Supreme Court's demand in Massachusetts v. EPA.;

4. Grant an order enjoining CCSF from taking further action with respect to Authority to Construct the SFERP power plant, Application Number 12344, or commencement of construction of its SFO CT plant until such time as the EPA defendants have complied with the Supreme Court's demand in Massachusetts v. EPA.;

UNDER THE THIRD CLAIM FOR RELIEF

5. Grant an order stating that, in the event that the EPA defendants make the expected endangerment finding in regard to Section 202 of the Clean Air Act, CCSF must neither request Authority to Construct the SFERP nor commence construction of either of its CT

power plants until the EPA defendants incorporate the endangerment finding into Section 111 and Sections 108 to 110 of the Clean Air Act and apply those rules to CCSF's power plants;

6.     Grant an order stating that, in the event that the EPA defendants make the expected endangerment finding in regard to Section 202 of the Clean Air Act, the BAAQMD is enjoined from issuing Authority to Construct the SFERP power plant until the EPA defendants incorporate the endangerment finding into Section 111 and Sections 108 to 110 of the Clean Air Act and the EPA and BAAQMD accordingly promulgate new rules that will apply to CCSF's SFERP power plant;

UNDER THE FOURTH CLAIM FOR RELIEF

7.     Grant an order enjoining the SFPUC taking further action in promoting its CT power plants until the General Manager and SFPUC staff in a public hearing correct the misrepresentations and facts that they have failed to disclose to date, so that the public is able to participate in a renewed, fully-informed discussion of the merits, or lack thereof, of CCSF's power plants, incorporating the relief requested under plaintiffs' fifth claim for relief;

UNDER THE FIFTH CLAIM FOR RELIEF

8.     Grant an order mandating that CCSF, its SFPUC, and SFPUC staff must comply with the San Francisco Precautionary Principle in doing the following:

a)     Creating a 2008 San Francisco Action Plan that explores and carefully analyzes electric reliability in San Francisco without the fossil fuel-burning CT power plants;

b)     Using the best available science to determine if the generation and transmission developments that will add over 650 pollution-free megawatts to San Francisco will make the city's electrical grid reliable in the absence of the Potrero Power plant, SFERP power plant, and SFO CT power plant;

c)     Using the best available science to determine, if some generation is required, where generation might be built elsewhere "on the S.F. peninsula" and outside of Bayview Hunters Point and Potrero;

d)  Using the best available science to determine how much renewable generation can be created with the $120 million CCSF planned to **spend on its CT power plants**, consisting of a $60 million bond and $60 million in combustion turbines;

e)  Acknowledging the flawed assumptions that have led CCSF's power plants to gain support in a climate which discourages contribution to global warming;

f)  Creating new standards for transparency within the SFPUC to encourage fully informed public participation as CCSF finds and selects the alternative to building fossil fuel-burning power plants in 2008.

UNDER ALL CLAIMS FOR RELIEF

9.    Grant plaintiffs their costs of suit herein and reasonable attorney and expert witness fees, and such other and further relief as may be proper.

Respectfully submitted this 14th day of December, 2007,

BRIGHTLINE DEFENSE PROJECT

Joshua Arce, Esq.
Attorney for Plaintiffs
SAN FRANCISCO CHAPTER OF THE A.
PHILIP RANDOLPH INSTITUTE,
CALIFORNIANS FOR RENEWABLE
ENERGY, LYNNE BROWN, REGINA
HOLLINS

- 26 -