EXHIBIT B

CALIFORNIA
ENERGY
COMMISSION

# SAN FRANCISCO ELECTRIC RELIABILITY PROJECT

## Application For Certification (04-AFC-1)
## The City and County of San Francisco



FINAL COMMISSION DECISION

OCTOBER 2006
(04-AFC-1)
CEC-800-2006-007-CMF





CALIFORNIA
ENERGY
COMMISSION

**SAN FRANCISCO ELECTRIC
RELIABILITY PROJECT**

Application For Certification (04-AFC-11)
The City and County of San Francisco

FINAL COMMISSION DECISION

# CALIFORNIA ENERGY COMMISSION

1516 9th Street
Sacramento, CA 95814
*http://www.energy.ca.gov/sitingcases/sanfrancisco/index.html*



**JAMES D. BOYD**
*Presiding Committee Member*

**JOHN L. GEESMAN**
*Associate Committee Member*

**STANLEY VALKOSKY**
*Chief Hearing Adviser*

**GARY FAY**
*Hearing Officer*

***COMMISSIONERS-***

**JACKALYNE PFANNENSTIEL**
*Chair*

**JAMES D. BOYD**
*Vice Chair*

**ARTHUR H. ROSENFELD, Ph. D.**
*Commissioner*

**JOHN L. GEESMAN**
*Commissioner*

**JEFFREY D. BYRON**
*Commissioner*

ORDER NO. 06-1003-01

BEFORE THE ENERGY RESOURCES CONSERVATION AND DEVELOPMENT COMMISSION
OF THE STATE OF CALIFORNIA

IN THE MATTER OF:

APPLICATION FOR CERTIFICATION
*FOR THE SAN FRANCISCO*
*ELECTRIC RELIABILITY PROJECT*

DOCKET NO. 04-AFC-1

## COMMISSION ADOPTION ORDER

This Commission Order adopts the Commission Decision on the SAN FRANCISCO ELECTRIC RELIABILITY PROJECT. The Commission Decision is based upon the evidentiary record of these proceedings (Docket No. 04-AFC-1) and considers the comments received at the October 3, 2006, special business meeting. The text of the attached Commission Decision contains a summary of the proceedings, the evidence presented, and the rationale for the findings reached and Conditions imposed.

This ORDER adopts by reference the text, Conditions of Certification, Compliance Verifications, and Appendices contained in the Commission Decision. It also adopts specific requirements contained in the Commission Decision which ensure that the proposed facility will be designed, sited, and operated in a manner to protect environmental quality, to assure public health and safety, and to operate in a safe and reliable manner.

## FINDINGS

The Commission hereby adopts the following findings in addition to those contained in the accompanying text:

1.    The SAN FRANCISCO ELECTRIC RELIABILITY PROJECT, will provide a degree of economic benefits and electricity reliability to the local area.

2.    The Conditions of Certification contained in the accompanying text, if implemented by the project owner, ensure that the project will be designed, sited, and operated in conformity with applicable local, regional, state, and federal laws, ordinances, regulations, and standards, including applicable public health and safety standards, and air and water quality standards.

3.  Implementation of the Conditions of Certification contained in the accompanying text will ensure protection of environmental quality and assure reasonably safe and reliable operation of the facility. The Conditions of Certification also assure that the project will neither result in, nor contribute substantially to, any significant direct, indirect, or cumulative adverse environmental impacts.

4.  Existing governmental land use restrictions are sufficient to adequately control population density in the area surrounding the facility and may be reasonably expected to ensure public health and safety.

5.  The project is subject to Fish and Game Code section 711.4 and the project owner must therefore pay an eight hundred fifty dollar ($850) fee to the California Department of Fish and Game.

6.  Construction and operation of the project, as mitigated, will not create any significant adverse environmental impacts. Therefore, the evidence of record also establishes that no feasible alternatives to the project, as described during these proceedings, exist which would reduce or eliminate any significant environmental impacts of the mitigated project.

7.  The evidence of record does not establish the existence of any environmentally superior alternative site.

8.  The evidence of record establishes that an environmental justice screening analysis was conducted and that the project, as mitigated, will not have a disproportionate impact on low-income or minority populations.

9.  The Decision contains a discussion of the public benefits of the project as required by Public Resources Code section 25523(h).

10. The Decision contains measures to ensure that the planned, temporary, or unexpected closure of the project will occur in conformance with applicable laws, ordinances, regulations, and standards.

11. The proceedings leading to this Decision have been conducted in conformity with the applicable provisions of Commission regulations governing the consideration of an Application for Certification and thereby meet the requirements of Public Resources Code sections 21000 et seq. and 25500 et seq.

ORDER NO. 06-1003-01

## ORDER

Therefore, the Commission **ORDERS** the following:

1.  The Application for Certification of the **SAN FRANCISCO ELECTRIC RELIABILITY PROJECT** as described in this Decision is hereby approved and a certificate to construct and operate the project is hereby granted.

2.  The approval of the Application for Certification is subject to the timely performance of the Conditions of Certification and Compliance Verifications enumerated in the accompanying text and Appendices. The Conditions and Compliance Verifications are integrated with this Decision and are not severable therefrom. While the project owner may delegate the performance of a Condition or Verification, the duty to ensure adequate performance of a Condition or Verification may not be delegated.

3.  This Decision is adopted, issued, effective, and final on October 3, 2006.

4.  Reconsideration of this Decision is governed by Public Resources Code, section 25530.

5.  Judicial review of this Decision is governed by Public Resources Code, section 25531.

6.  The Commission hereby adopts the Conditions of Certification, Compliance Verifications, and associated dispute resolution procedures as part of this Decision in order to implement the compliance monitoring program required by Public Resources Code section 25532. All conditions in this Decision take effect immediately upon adoption and apply to all construction and site preparation activities including, but not limited to, ground disturbance, site preparation, and permanent structure construction.

7.  The project owner shall provide the Executive Director a check in the amount of eight hundred fifty dollars ($850), payable to the California Department of Fish and Game.

ORDER NO. 06-1003-01

8.   The Executive Director of the Commission shall transmit a copy of this Decision and appropriate accompanying documents, including the Department of Fish and Game fee, as provided by Public Resources Code section 25537, California Code of Regulations, title 20, section 1768, and Fish and Game Code section 711.4.

Dated October 3, 2006, at Sacramento, California.

JACKALYNE PFANNENSTIEL
Chairman

JAMES D. BOYD
Vice Chair

JOHN L. GEESMAN
Commissioner

ARTHUR H. ROSENFELD
Commissioner

JEFFREY D. BYRON
Commissioner

# V.    PUBLIC HEALTH AND SAFETY ASSESSMENT

Operation of the SFERP will create combustion products and utilize certain hazardous materials that could potentially cause adverse health effects to the general public and to the workers at the facility. The following sections describe the regulatory programs, standards, protocols, and analyses that address these issues.

## A.    AIR QUALITY

This section examines the potential adverse impacts of criteria air pollutant emissions resulting from project construction and operation. In consultation with the local air pollution control district, the Commission determines whether the project will likely conform with applicable LORS, whether it will likely result in significant air quality impacts, including violations of ambient air quality standards, and whether the project's proposed mitigation measures will likely reduce potential impacts to insignificant levels.

Applicant and Staff reached agreement on all relevant issues, including the Conditions of Certification following this narrative. (Exs. 46, 48.) Intervenor CARE also stipulated to the analysis of these matters contained in Staff's testimony but then notified the Committee in its September 20, 2006 comments on the PMPD (page 13) that it no longer agreed with Staff. (5/22/06 RT 304-305: 3-4.) Intervenor Sarvey, however, attempted to persuade the Committee that the analysis of record was flawed on a number of grounds, including an inadequate cumulative impacts analysis and ineffective mitigation measures. (Sarvey Opening Brief, pp. 2-7; Reply Brief, pp. 1-10, 25-28; July 21, 2006 Reply Brief to Staff Late Filing, pp. 5-16.)

Our examination of the record leads us to the conclusion that intervenor Sarvey's contentions are unsupported by the evidence. Applicant (Opening Brief, pp. 30-

52; Reply Brief, pp. 5-25) and Staff (Opening Brief, pp. 3-15; Reply Brief, pp. 1-5) each thoroughly discount this intervenor's assertions.   We have therefore included only the most salient points of the relevant discussion in the next section.

SUMMARY AND DISCUSSION OF THE EVIDENCE

The Federal Clean Air Act and the California Clean Air Act both require the establishment of standards for ambient concentrations of air pollutants, called ambient air quality standards (AAQS).   The state AAQS, established by the California Air Resources Board (CARB), are typically lower (more protective) than the federal AAQS which are established by the U.S. EPA. The state and federal air quality standards are listed in **AIR QUALITY Table 1**.

### AIR QUALITY Table 1
### Ambient Air Quality Standards

| Pollutant | Averaging Time | California Standards | Federal Standards | |
|---|---|---|---|---|
| | | | Primary | Secondary |
| Ozone(O₃) | 8-hour | 0.07 ppm | 0.08 ppm | Same as primary |
| Particulate Matter (PM₁₀) | Ann.Geo. Mean | 20 µg/m³ | — | Same as primary |
| | 24-hour | 50 µg/m³ | 150 µg/m³ | |
| | Ann.Arit. Mean | — | 50 µg/m³ | |
| Fine Particulate Matter (PM2.5) | 24-hour | No separate standard | 65 µg/m³ | Same as primary |
| | Ann.Arit. Mean | 12 µg/m3 | 15 µg/m³ | Same as primary |
| Carbon Monoxide (CO) | 1-hour | 20 ppm (23 mg/m³) | 35 ppm (40 mg/m³) | None |
| | 8-hour | 9 ppm (10 mg/m³) | 9 ppm (10 mg/m³) | |
| Nitrogen Dioxide (NO₂) | 1-hour | 0.25 ppm (470 µg/m³) | — | Same as primary |
| | Ann.AritMean | — | 0.053 ppm (100 µg/m³) | |

| Lead(Pb) | 30-day | 1.5 µg/m$^3$ | --- | Same as primary |
|---|---|---|---|---|
| | Cal. Quarter | --- | 1.5 µg/m$^3$ | |
| Sulfur Dioxide (SO$_2$) | Ann.Arit. Mean | --- | 0.03 ppm (80 µg/m$^3$) | --- |
| | 24-hour | 0.04 ppm (105 µg/m$^3$) | 0.147 ppm (365 µg/m$^3$) | --- |
| | 3-hour | --- | --- | 0.5 ppm (1300 µg/m$^3$) |
| | 1-hour | 0.25 ppm (655 µg/m$^3$) | --- | --- |
| Sulfates | 24-hour | 25 µg/m$^3$ | No federal standard | |
| H$_2$S | 1-hour | 0.03 ppm (42 µg/m$^3$) | No federal standard | |

Source: Exhibit 46, p. 4.1-7.

In general, an area is designated as attainment if the concentration of a particular air contaminant does not exceed the standard. Likewise, an area is designated as non-attainment for an air contaminant if that contaminant standard is violated. Where not enough ambient data are available to support designation as either attainment or non-attainment, the area can be designated as unclassified. An area could be attainment for one air contaminant while non-attainment for another, or attainment for the federal standard and non-attainment for the state standard for the same air contaminant.

Currently, the Bay Area Air Quality Management District (BAAQMD or District) and the CARB measure ambient air quality concentrations for NO$_x$, VOC, CO, PM$_{10}$, PM$_{2.5}$, and SO$_2$. These measurements are taken at the Arkansas Street monitoring station, located about one-half mile northwest of the SFERP site.[19] Although Intervenor Sarvey contends that use of this monitoring site is inappropriate (Opening Brief, pp. 4-5.), expert testimony establishes that there are no meaningful differences in pollutant levels if measured at different locations

---

[19] Lead, sulfates and hydrogen sulfide (H$_2$S) are not measured at this monitoring station because the responsible regulatory agencies believe that the area is attainment for these air contaminants.

in the project vicinity. (5/22/06 RT 233, 260-61; Ex. 46, pp. 4.1-8 to 4.1-9; see also, Applicant Reply Brief, pp. 5-7; Staff Opening Brief, p. 8.)

The BAAQMD is classified as "attainment" for the state $NO_2$ standard, the state one and eight hour CO standards, and the federal annual and 24-hour $PM_{2.5}$ standards. (Ex 46, pp. 4.1-10 to 4.1-12.) The District is classified as a "non-attainment" for the state 1-hour ozone standard and the state 24-hour $PM_{10}$ standard.[20] (Ex. 46, pp. 4.1-10, 4.1-12.) The BAAQMD meets applicable standards for all other criteria pollutants; hence, its efforts are focused on meeting the ozone and the PM standards. (Staff Opening Brief, pp. 3-4.)

The SFERP will emit $NO_x$, VOC (volatile organic compounds), $SO_x$, CO, and $PM_{10.}$ Construction and operation of the SFERP will result in 15.2 tpy of PM emissions which will contribute to the existing violation of applicable state standards. (Ex. 46, p. 4.1-17.) Project construction will also result in short term CO and PM emissions, chiefly from grading and operation of diesel equipment. (Ex. 46, pp. 4.1-17 to 4.1-18.) Thus the SFERP could contribute to existing violations of the state ozone and PM standards. (Ex. 46, p. 4. 1-20; Applicant Opening Brief, p. 35.)

There is no dispute that the project will use the Best Available Control Technology (BACT). Each combustion turbine will limit the $NO_x$ emissions to 2.5 ppm @ 15 percent $O_2$ through the use of water injection and selective catalytic reduction (SCR); a catalyst system on each turbine will maintain CO emissions at no more than 4 ppm. (Ex. 48, Table 3.)

Precursor organic compounds will be limited to 2.0 ppmvd (averaged over three hours), and $SO_2$ and $PM_{10}$ emissions will be controlled through use of natural gas

---

[20] Although CARB has recently adopted an annual $PM_{2.5}$ standard of t2 $\mu g/mm^3$, it has not determined the attainment status of any district. Adoption of a new 24-hour $PM_{2.5}$ standard has been deferred. (Ex. 46, p. 4.1-12.)

as a fuel. (Ex. 55, p. 8.1-50.)  Ammonia emissions from the exhaust stack ("ammonia slip") are limited to no more than 10 ppm, a level which the record establishes both meets District requirements and is the lowest feasible rate for a peaking facility such as the SFERP. (Ex. 46, p. 4.1-49; Ex. 55, p. 24; see Applicant Opening Brief, pp. 46-49; Staff Opening Brief, p. 12 – 13.)

The SFERP will be limited during operation to emissions of 39.8 tons of $NO_x$, 27.9 tons of CO, 7.7 tons of POC, [21] 15.2 tons of $PM_{10}$, and 2.7 tons of $SO_2$ annually.  (Ex. 46, p. 4.1-16; Ex. 48 Table 3; Condition of Certification **AQ 21**.) Furthermore, the project will mitigate emissions of the ozone precursors ($NO_x$ and POC/VOC) by using 47.5 tons of $NO_x$ emission reduction credits from the nearby Potrero power plant site. (5/22/06 RT 221; Ex. 46, p. 4.1-20.)  Intervenor Sarvey apparently disagrees with the propriety of using these credits.  (Ex. 74; see also Reply Brief, pp. 6-7.)  As explained by both Applicant and Staff, however, use of ERCs in the present instance is proper and wholly consistent with federal and state plans for mitigating air emissions.  (5/22/06 RT 226-27; Applicant Opening Brief, pp. 38-41; Staff Opening Brief, pp. 8-10.)  CO emissions (for which the District is in attainment) will be adequately controlled by the use of BACT, and the project's level of $SO_2$ emissions.  2.7 tons per year is well below the level (100 tons per year) which would require offsets under District rules[22].  (Ex. 46. p. 4.1-10; Staff Opening Brief, pp. 10-11.)  These matters are confirmed by the BAAQMD's revised Final Determination of Compliance.  (Ex. 55; see also Applicant Opening Brief, pp. 30-32; Staff Opening Brief, pp. 3-5.)

---

[21] POC (precursor organic compounds) and VOC (volatile organic compounds) are equivalent.

[22] Intervenor Sarvey continues to contend that $SO_x$ emissions remain unmitigated.  (Reply Brief, pp. 6, 8; July 21, 2006 Reply Brief to Staff Late Filing, p. 10.)  The street sweeping program will produce an excess of 9 tons per year of $PM_{10}$ reduction.  This more than offsets the 2.7 tons of $SO_x$ emissions, at a 3:1 ratio. (5/31/06 RT 28.)  In any event, $SO_x$ emissions do not interfere with the attainment or maintenance of applicable ambient air quality standards.

BACT dictates that the turbines emission level for $PM_{10}$ will be restricted to no more than 2.5 lbs/hour. (Ex. 48; see also 5/22/06 RT 228-29.)  In addition, and to address $PM_{10}$ and $PM_{2.5}$ emissions from operation, Applicant will provide 23.6 tpy of $PM_{10}$ offsets.   These will be realized from an enhanced street sweeping program designed to remove dust from the street, at about a 1.5:1 ratio when compared to project emissions, and thus reduce overall PM levels in the project vicinity.   (5/22/06 RT 223-24; Ex. 48; Applicant Opening Brief, p. 37.)   In response to community concerns, Applicant will also institute an extensive tree planting program and an indoor program focusing on improving air quality in area residences, especially those of asthmatics. (5/21/06 RT 224.)

Applicant will further mitigate $PM_{2.5}$ emissions by implementing a program to subsidize area homeowners in replacing wood stoves/fireplaces with natural gas or propane fueled units.[23] (Ex. 46, p. 4.1-21; Condition of Certification **AQ-SC11**.) In case this replacement program is not implemented, Applicant is obligated to provide 36 tpy of $SO_x$ offsets to mitigate (at a 3:1 ratio) the $PM_{2.5}$ emissions. (5/22/06 RT 225-26; Ex. 48; Staff Opening Brief, pp. 10 – 11; Staff Reply Brief, p. 4; Condition of Certification **AQ-SC12**.)

Intervenor Sarvey asserts that the street sweeping PM mitigation agreed to by Applicant and Staff is inadequate since it rains in the vicinity during the winter months (when most violations of applicable standards occur), and that the use of regional $SO_x$ offsets does not mitigate local air quality impacts.  (Opening Brief, pp. 5-6; Reply Brief,  pp. 7-8, 25; July 21, 2006 Reply Brief to Staff Late Filing, p. 11.)

The record shows, however, that the methodology used to calculate the PM emission factors takes into account the frequency of rain. (Ex. 38; see Applicant Reply Brief, pp. 7-9.) Moreover, direct expert testimony contradicts the

---

[23] Wood smoke is a major contributor to $PM_{10}$ standard violations, especially during the winter. (Ex. 46, p. 4.1-12.)

intervenor's assertions regarding the effectiveness of the street sweeping mitigation (5/22/06 RT 252) and the intervenor introduced no credible testimony to the contrary. Intervenor's second point – that the $SO_x$ offsets are not necessarily local – simply disregards and implicitly disputes the accepted regional emphasis of state and federal air quality regulation strategies.

In sum, the evidence clearly establishes that the SFERP will meet the provisions of all applicable air quality laws, and will not cause any new violations of state or federal standards, even when modeled with worst case ambient concentrations. (Ex. 46, p. 4.1-19.)   Thus, there are no direct adverse air quality impacts attributable to the project.

The evidence also establishes that a menu of mitigation measures, including the use of ultra-low sulfur diesel fuel, low emission diesel engines, soot filters, and site fencing will apply in controlling the short-term PM impacts resulting from project construction.  (Ex. 46, pp. 4.1-17 to 4.1-19; see Conditions of Certification **AQ-SC1 to AQ-SC5.**)

Finally, the record clearly establishes that Applicant and Staff addressed the issue of cumulative impacts by performing multiple analyses of the SFERP's impacts in combination with those of other projects.  For example, Applicant conducted (Ex. 15; Opening Brief, pp. 34-36):

- A dispersion modeling analysis of worst-case project impacts added to worst-case measured ambient concentrations.

- A dispersion modeling analysis of the worst-case combined impacts of the project in combination with existing nearby power plants and reasonably foreseeable projects, added to worst-case measured ambient concentrations.

- A comparison of project emissions of the same pollutants from other, existing sources.

Staff did an independent two-part cumulative impact analysis, including both the "list" and "summary of projections" approaches mentioned in section 15130 of the CEQA Guidelines. (Ex. 46, pp. 4.1-21 to 4.1-30; Opening Brief, pp. 14–15.) The evidence shows that no matter which analysis one chooses, the conclusion is the same: with implementation of mitigation required in the Conditions of Certification, the SFERP will not cause, or contribute to, an adverse cumulative air quality impact.

Intervenor Sarvey, however, contends that the cumulative impact analyses are insufficient chiefly because, in his view, they fail to include all reasonably foreseeable projects. More specifically, the intervenor believes the analysis of record must, but did not, include projects identified in the Southern Waterfront Supplemental Environmental Impact Report (SEIR)[24] as well as the Illinois Street Bridge project. (Opening Brief, pp. 3-4, 13; Reply Brief, pp. 2-5; July 21, 2006 Reply Brief to Staff Late Filing, pp. 5-10.)

It is unclear to us in what respects the cumulative analysis of record is arguably deficient. As Applicant points out, each project identified in the SEIR must necessarily fall into one of the following categories (Opening Brief, p. 44.):

- The project has been built, and its impacts are thus included in one of the cumulative air quality impact analyses prepared by the city because its emissions are reflected in the background data used by the City, and included in the baseline analysis. (Ex. 15, p. 8.1-44.)

- The project has not been built, but has an application pending before the BAAQMD, and the project was identified by the BAAQMD and explicitly analyzed in one of the cumulative impact analyses prepared by the City, and also included in the baseline analysis. (Ex. 15, vol. 2, Appendix 8.1F, pp. F-2 to F-8.)

---

[24] The intervenor referenced this five year old document numerous times but, despite several requests, failed to provide a readable copy. Moreover, it is not part of the evidentiary record of the case, but was assigned "Exhibit 92B" for identification purposes only. (5/31/06 RT 44-45.)

- The project has not been built, has an application pending before the BAAMMD, but was not included in the cumulative impacts analysis because its emissions were below the de minimis levels identified in the City's cumulative impacts protocol.

- The project has not been built, and has not yet submitted an application to the BAAQMD, and therefore is no longer reasonably foreseeable.

Staff elaborates upon these points, confirming that projects identified in the SEIR which have been built are part of the existing ambient background and thus used in preparation of the cumulative analyses of record. (5/31/06 RT 230, 285, 287.) Moreover, some projects (e.g., the Illinois Bridge and MUNI projects) will result only in temporary construction emissions, some of which may have already occurred. (Reply Brief, p. 2.)

After considering these matters, we are satisfied that the cumulative impact analyses of record are more than sufficient to satisfy the requirements of CEQA. The impacts of the SFERP have been considered in conjunction with those actual and reasonably foreseeable projects. The SFERP's contribution to adverse impacts is less than cumulatively considerable and therefore less than significant since the Conditions of Certification require Applicant to implement appropriate measures to proportionately alleviate the project's contribution to any cumulative impact. [14 Cal. Code of Regs., §15130(a).] In addition, the persuasive (and uncontradicted) evidence of record establishes that nothing in the SEIR would change the ultimate conclusions by Applicant's and Staff's expert witnesses that, as mitigated, the SFERP will not directly cause and will not contribute to significant adverse cumulative impacts. (5/31/06 RT 32-35; Ex. 46, p. 4.1-28; Applicant Reply Brief, pp. 25–26; Staff Reply Brief p. 3.)

## FINDINGS AND CONCLUSIONS

Based on the persuasive weight of the evidence of record, we find as follows:

1. The proposed SFERP is located within the jurisdiction of the Bay Area Air Quality Management District.

2. The District is classified as non-attainment for the state 1-hour ozone, and the state 24-hour and annual $PM_{10}$, standards. The District meets applicable standards for all other criteria pollutants.

3. The project will employ the best available technology (BACT) to control emissions of criteria pollutants.

4. Project emissions will be fully offset.

5. Use of emission reduction credits in this case is appropriate, and is consistent with applicable federal and state emission control strategies.

6. The project will not cause new violations of any $NO_2$, $SO_2$, or CO ambient air quality standards. Therefore, its $NO_x$, $SO_x$, and CO emission impacts are not significant.

7. The project's $NO_x$ and VOC emissions can contribute to the existing violations of the ozone standards. However, the required mitigation (in the form of emission reduction credits) will mitigate the project's impact to a level that is less than significant.

8. The project's $PM_{10}$ emissions can contribute to the existing violations of the state 24-hour $PM_{10}$ air quality standard. However, the required mitigation (in the form of an enhanced street sweeping program) will mitigate the project's impacts to a level that is less than significant.

9. The project's fine particulate matter emission contribution will be mitigated to a level of less than significant by the implementation of the local street sweeping and the woodstove/fireplace replacement or modification programs, or by the surrender of sulfur oxide emission reduction credits.

10. The District issued a Final Determination of Compliance that finds the SFERP will comply with all applicable District rules for project operation.

11. The evidence establishes that an ammonia slip level of 10 ppm is appropriate for this peaking project.

12. The evidence of record does not persuasively establish that an ammonia slip level of 10 ppm will lead to the formation of secondary particulates in the area of this project, or result in significant adverse impacts.

13. The evidence of record does not establish that a reduction in the level of ammonia slip to 5 ppm from 10 ppm will lead to a reduction or elimination of a significant environmental impact.

14. The project's construction-related impacts are temporary and short-term in nature. They are mitigated to below a level of significance by measures identified in the Conditions of Certification.

15. Data gathered from the Arkansas Street monitoring station is appropriate to use in modeling air quality impacts in this case.

16. The record contains an adequate analysis of the project's contributions to cumulative air quality impacts.

17. Projects, which have been constructed, undergoing construction, or otherwise reasonably foreseeable and were identified in the Southern Waterfront SEIR have been considered in the cumulative impact analyses of record. Impacts arguably attributable to such projects do not alter conclusions reached concerning the SFERP's contribution to cumulative air quality impacts.

18. The project's offset package complies with Public Resources Code, section 25523 (d)(2).

19. Implementation of the Conditions of Certification listed below ensures that the SFERP will not result in any significant direct, indirect, or cumulative adverse impacts to air quality.


The Commission therefore concludes that the mitigation measures imposed are sufficient to ensure that the SFERP will conform with all applicable laws, ordinances, regulations, and standards relating to air quality as set forth in the pertinent portion of **Appendix A** of this Decision.


## CONDITIONS OF CERTIFICATION

**AQ-SC1**    Air Quality Construction Mitigation Manager (AQCMM): The project owner shall designate and retain an on-site AQCMM who shall be responsible for directing and documenting compliance with conditions **AQ-SC3, AQ-SC4** and **AQ-SC5** for the entire project site and linear

facility construction. The on-site AQCMM may delegate responsibilities to one or more AQCMM Delegates. The AQCMM and AQCMM Delegates shall have full access to all areas of construction on the project site and linear facilities, and shall have the authority to stop any or all construction activities as warranted by applicable construction mitigation conditions. The AQCMM and AQCMM Delegates may have other responsibilities in addition to those described in this condition. The AQCMM shall not be terminated without written consent of the CPM.

**Verification:** At least 60 days prior to the start of ground disturbance, the project owner shall submit to the CPM for approval the name, resume, qualifications, and contact information for the on-site AQCMM and all AQCMM Delegates. The AQCMM and all Delegates must be approved by the CPM before the start of ground disturbance.

**AQ-SC2**   Air Quality Construction Mitigation Plan (AQCMP): The project owner shall provide an AQCMP, for approval, which details the steps that will be taken and the reporting requirements necessary to ensure compliance with conditions **AQ-SC3, AQ-SC4** and **AQ-SC5**.

**Verification:**    At least 60 days prior to the start of any ground disturbance, the project owner shall submit the AQCMP to the CPM for approval. The CPM will notify the project owner of any necessary modifications to the plan within 30 days from the date of receipt.

**AQ-SC3**   Construction Fugitive Dust Control: The AQCMM shall submit documentation to the CPM in each Monthly Compliance Report (MCR) that demonstrates compliance with the following mitigation measures for the purposes of preventing all fugitive dust plumes from leaving the project. Any deviation from the following mitigation measures shall require prior CPM notification and approval.

   a) All unpaved roads and disturbed areas in the project and linear construction sites shall be watered as frequently as necessary to comply with the dust mitigation objectives of **AQ-SC4**. The frequency of watering can be reduced or eliminated during periods of precipitation.

   b) No vehicle shall exceed 15 miles per hour within the construction site.

   c) The construction site entrances shall be posted with visible speed limit signs.

   d) All construction equipment vehicle tires shall be inspected and washed as necessary to be cleaned free of dirt prior to entering paved roadways.

   e) Gravel ramps of at least 20 feet in length must be provided at the tire washing/cleaning station.

113

f) All unpaved exits from the construction site shall be graveled or treated to prevent track-out to public roadways.

g) All construction vehicles shall enter the construction site through the treated entrance roadways, unless an alternative route has been submitted to and approved by the CPM.

h) Construction areas adjacent to any paved roadway shall be provided with sandbags or other measures as specified in the Storm Water Pollution Prevention Plan (SWPPP) to prevent run-off to roadways.

i) All paved roads within the construction site shall be swept at least twice daily (or less during periods of precipitation) on days when construction activity occurs to prevent the accumulation of dirt and debris.

j) At least the first 500 feet of any public roadway exiting from the construction site shall be swept at least twice daily (or less during periods of precipitation) on days when construction activity occurs or on any other day when dirt or runoff from the construction site is visible on the public roadways.

k) All soil storage piles and disturbed areas that remain inactive for longer than 10 days shall be covered, or shall be treated with appropriate dust suppressant compounds.

l) All vehicles that are used to transport solid bulk material on public roadways and that have potential to cause visible emissions shall be provided with a cover, or the materials shall be sufficiently wetted and loaded onto the trucks in a manner to provide at least one foot of freeboard.

m) Wind erosion control techniques (such as windbreaks, water, chemical dust suppressants, and/or vegetation) shall be used on all construction areas that may be disturbed. Any windbreaks installed to comply with this condition shall remain in place until the soil is stabilized or permanently covered with vegetation.

n) Construction areas adjacent to any publicly accessible roadway shall be provided with an eight foot high temporary fence. This fence shall be lined with material (such as solid construction tarp) to prevent transport of fugitive dust to publicly accessible areas. This fence can be removed after the end of the facility's construction period.

**Verification:** The project owner shall include in the Monthly Compliance Report (MCR): (1) a summary of all actions taken to maintain compliance with this condition; (2) copies of any complaints filed with the air district in relation to project construction; and (3) any other documentation deemed necessary by the CPM and AQCMM to verify compliance with this condition. Such information may be provided via electronic format or disk at the project owner's discretion.

**AQ-SC4**    <u>Dust Plume Response Requirement</u>: The AQCMM or an AQCMM Delegate shall monitor all construction activities for visible dust plumes. Observations of visible dust plumes that have the potential to be transported (1) off the project site or (2) 200 feet beyond the centerline of the construction of linear facilities or (3) within 100 feet upwind of any regularly occupied structures not owned by the project owner indicate that existing mitigation measures are not resulting in effective mitigation. The AQCMP shall include a section detailing how the additional mitigation measures will be accomplished within the time limits specified. The AQCMM or Delegate shall implement the following procedures for additional mitigation measures in the event that such visible dust plumes are observed:

Step 1: The AQCMM or Delegate shall direct more intensive application of the existing mitigation methods within 15 minutes of making such a determination.

Step 2: The AQCMM or Delegate shall direct implementation of additional methods of dust suppression if step 1 specified above fails to result in adequate mitigation within 30 minutes of the original determination.

Step 3: The AQCMM or Delegate shall direct a temporary shutdown of the activity causing the emissions if step 2 specified above fails to result in effective mitigation within one hour of the original determination. The activity shall not restart until the AQCMM or Delegate is satisfied that appropriate additional mitigation or other site conditions have changed so that visual dust plumes will not result upon restarting the shutdown source. The owner/operator may appeal to the CPM any directive from the AQCMM or Delegate to shut down an activity, provided that the shutdown shall go into effect within one hour of the original determination, unless overruled by the CPM before that time.

**<u>Verification:</u>** The project owner shall include in the Monthly Compliance Report (MCR): (1) a summary of all actions taken to maintain compliance with this condition; (2) copies of any complaints filed with the air district in relation to project construction; and (3) any other documentation deemed necessary by the CPM and AQCMM to verify compliance with this condition. Such information may be provided via electronic format or disk at the project owner's discretion.

**AQ-SC5**    <u>Diesel-Fueled Engine Control</u>: The AQCMM shall submit to the CPM, in the Monthly Compliance Report (MCR), a construction mitigation report that demonstrates compliance with the following mitigation measures for the purposes of controlling diesel construction-related emissions. Any deviation from the following mitigation measures shall require prior CPM notification and approval.

a) All diesel-fueled engines used in the construction of the facility shall be fueled only with ultra-low sulfur diesel, which contains no more than 15 ppm sulfur.

b) All diesel-fueled engines used in the construction of the facility shall have clearly visible tags issued by the on-site AQCMM showing that the engine meets the conditions set forth herein.

c) All construction diesel engines, which have a rating of 100 hp or more, shall meet, at a minimum, the Tier 2 California Emission Standards for Off-Road Compression-Ignition Engines as specified in California Code of Regulations, Title 13, section 2423(b)(1) unless certified by the on-site AQCMM that such engine is not available for a particular item of equipment. In the event a Tier 2 engine is not available for any off-road engine larger than 100 hp, that item of equipment shall be equipped with a Tier 1 engine. In the event a Tier 1 item of equipment is not available for any off-road engine larger than 100 hp, that engine shall be equipped with a catalyzed diesel particulate filter (soot filter), unless certified by engine manufacturers or the on-site AQCMM that the use of such devices is not practical for specific engine types. For purposes of this condition, the use of such devices is "not practical" if, among other reasons:

1) There is no available soot filter that has been certified by either the California Air Resources Board or U.S. Environmental Protection Agency for the engine in question; or

2) The construction equipment is intended to be on-site for ten (10) days or less.

3) The CPM may grant relief from this requirement if the AQCMM can demonstrate that they have made a good faith effort to comply with this requirement and that compliance is not possible.

4) The CPM may grant relief from Tier 2 requirement for construction diesel engines, which have a rating of 100 hp or more, if they are owned and/or operated by a Disadvantaged Business Enterprise certified by the San Francisco Human Rights Commission.

d) The use of a soot filter may be terminated immediately if one of the following conditions exists, provided that the CPM is informed within ten (10) working days of the termination:

1) The use of the soot filter is excessively reducing normal availability of the construction equipment due to increased downtime for maintenance, and/or reduced power output due to an excessive increase in backpressure.

116

2)  The soot filter is causing or is reasonably expected to cause significant engine damage.

3)  The soot filter is causing or is reasonably expected to cause a significant risk to workers or the public.

4)  Any other seriously detrimental cause which has the approval of the CPM prior to the termination being implemented.

e)  All heavy earthmoving equipment and heavy duty construction related trucks with engines meeting the requirements of (c) above shall be properly maintained and the engines tuned to the engine manufacturer's specifications.

f)  All diesel heavy construction equipment shall not remain running at idle for more than five minutes, to the extent practical.

**Verification:**     The project owner shall include in the MCR: (1) a summary of all actions taken to maintain compliance with this condition; (2) copies of all diesel fuel purchase records; (3) a list of all heavy equipment used on site during that month, including the owner of that equipment and a letter from each owner indicating that equipment has been properly maintained; and (4) any other documentation deemed necessary by the CPM and AQCMM to verify compliance with this condition.  Such information may be provided via electronic format or disk at the project owner's discretion.

**AQ-SC6**     The project owner shall submit to the CPM for review and approval any modification proposed by the project owner to any project air permit.  The project owner shall submit to the CPM any modification to any permit proposed by the District or U.S. EPA, and any revised permit issued by the District or U.S. EPA for the project.

**Verification:**     The project owner shall submit any proposed air permit modification to the CPM within five working days of its submittal either by 1) the project owner to an agency, or 2) receipt of proposed modifications from an agency.  The project owner shall submit all modified air permits to the CPM within 15 days of receipt.

**AQ-SC7**     The project owner shall surrender 47.5 tons of NOx from the emission offset credits certificate number 896 at the time that surrender is required by condition **AQ-38**.  The project owner may request CPM approval for any substitutions or modification of credits. The CPM, in consultation with the District, may approve any such change to the NOx ERC list provided that the project remains in compliance with all applicable laws, ordinances, regulations, and standards, the requested change(s) clearly will not cause the project to result in a significant environmental impact, and each requested change is consistent with applicable federal and state laws and regulations.

**Verification:**    The project owner shall submit to the CPM a list of $NO_x$ ERCs to be surrendered to the District at least 60 days prior to initial startup.  If the CPM, in consultation with the District, approves a substitution or modification, the CPM shall file a statement of the approval with the commission docket and mail a copy of the statement to every person on the post-certification mailing list.  The CPM shall maintain an updated list of approved $NO_x$ ERCs for the project.

**AQ-SC8**    The project owner shall comply with all staff (AQ-SC) and district (AQ) Conditions of Certification.  The CPM, in consultation with the District, may approve as an insignificant change any change to an air quality Condition of Certification, provided that: (1) the project remains in compliance with all applicable laws, ordinances, regulations, and standards; (2) the requested change clearly will not cause the project to result in a significant environmental impact; (3) no additional mitigation or offsets will be required as a result of the change; (4) no existing daily, quarterly, or annual permit limit will be exceeded as a result of the change; and (5) no increase in any daily or annual permit limit will be necessary as a result of the change.

**Verification:**    The project owner shall notify the CPM in writing of any proposed change to a Condition of Certification pursuant to this condition and shall provide the CPM with any additional information the CPM requests to substantiate the basis for approval.

**AQ-SC9**    If the project owner does not participate in the voluntary California Climate Action Registry, then the project owner shall report on a quarterly basis to the CPM the quantity of greenhouse gases (GHG) emitted as a direct result of facility electricity production as follows:

The project owner shall maintain a record of fuel use in units of million-Btus (mmBtus) for all fuels burned on-site for the purpose of power production.  These fuels shall include but are not limited to: (1) all fuel burned in the combustion turbines, (2) HRSGs (if applicable) or auxiliary boiler (if applicable), and (3) all fuels used in any capacity for the purpose of turbine startup, shutdown, operation or emission controls.

The project owner may perform annual source tests of $CO_2$ and $CH_4$ emissions from the exhaust stacks while firing the facility's primary fuel, using the following test methods or other test methods as approved by the CPM.  The project owner shall produce fuel-based emission factors in units of lbs GHG per mmBtu of fuel burned from the annual source tests.  If a secondary fuel is approved for the facility, the project owner may also perform these source tests while firing the secondary fuel.

| Pollutant | Test Method |
|-----------|-------------|
| $CO_2$ | EPA Method 3A |
| $CH_4$ | EPA Method 18 (VOC measured as $CH_4$) |

As an alternative to performing annual source tests, the project owner may use the Intergovernmental Panel on Climate Change (IPCC) Methodologies for Estimating Greenhouse Gas Emissions (MEGGE). If MEGGE is chosen, the project owner shall calculate the $CO_2$, $CH_4$, and $N_2O$ emissions using the appropriate fuel-based carbon content coefficient (for $CO_2$) and the appropriate fuel-based emission factors (for $CH_4$ and $N_2O$).

The project owner shall convert the $N_2O$ and $CH_4$ emissions into $CO_2$ equivalent emissions using the following IPCC Global Warming Potentials (GWP): 310 for $N_2O$ (1 pound of $N_2O$ is equivalent to 310 pounds of $CO_2$) and 21 for $CH_4$.

The project owner shall maintain a record of all $SF_6$ that is used for replenishing on-site transformers. At the end of each reporting period, the project owner shall total the mass of $SF_6$ used and convert that to a $CO_2$ equivalent emission using the IPCC GWP of 23,900 for $SF_6$.

On a quarterly basis, the project owner shall report the $CO_2$ and $CO_2$ equivalent emissions from the described emissions of $CO_2$, $N_2O$, $CH_4$, and $SF_6$.

**Verification:** Any greenhouse gas emissions that are reported by the project owner to the California Climate action Registry or pursuant to this condition shall be reported to the CPM as part of the fourth Quarterly or the annual Air Quality Report.

**AQ-SC10**  For as long as the project is in operation, the project owner shall provide daily street cleaning services using high-efficiency street sweepers for a total of no less than 9.6 miles of Third, Cesar Chavez, 16th, Illinois, Tennessee, Evans, 23rd, 25 streets and Pennsylvania Ave.

**Verification:** The project owner shall keep daily records of the street sweeping activities and shall submit to the CPM the quarterly and annual compliance reports as required by Condition **AQ-18**.

**AQ-SC11**  The project owner shall provide an additional 4 TPY of $PM_{2.5}$ emission reduction credits by subsidizing the replacement or modification (blocking chimneys) of wood stoves or fireplaces.

**Verification:**    At least 30 days prior to the start of any site clearing or ground disturbance activities, the project owner shall provide the CPM, for approval, a final plan to acquire 4 TPY of PM$_{2.5}$ emission reduction credits. The wood stove and fireplace replacement or modification programs must start after the plan approval, and no later than 60 days prior to initial startup.

**AQ-SC12**    In lieu of compliance with Condition **AQ-SC11**, the project owner shall provide 36 TPY of SO$_x$ emission reduction credits acquired in the local Hunters Point and/or Potrero areas to provide an annual equivalent of 12 TPY of PM$_{2.5}$.

**Verification:**  The project owner shall submit to the CPM a list of ERCs to be surrendered to the District at least 60 days prior to initial startup.

## DISTRICT CONDITIONS OF CERTIFICATION

### *Permit Conditions*

**Definitions:**

| | |
|---|---|
| Clock Hour: | Any continuous 60-minute period beginning on the hour. |
| Calendar Day: | Any continuous 24-hour period beginning at 12:00 AM or 0000 hours. |
| Year: | Any consecutive twelve-month period of time |
| Heat Input: | All heat inputs refer to the heat input at the higher heating value (HHV) of the fuel, in Btu/scf. |
| Rolling 3-hour period: | Any three-hour period that begins on the hour and does not include start-up or shutdown periods. |
| Firing Hours: | Period of time during which fuel is flowing to a unit, measured in fifteen-minute increments. |
| MM Btu: | million British thermal units |
| Gas Turbine Start-up Mode: | The lesser of the first 120 minutes of continuous fuel flow to the Gas Turbine after fuel flow is initiated or the period of time from Gas Turbine fuel flow initiation until the Gas Turbine achieves two consecutive CEM data points in compliance with the emission concentration limits of conditions 20(b) and 20(d). |
| Gas Turbine Shutdown Mode: | The lesser of the 30 minute period immediately prior to the termination of fuel flow to the Gas Turbine or the period of time from non-compliance with any requirement listed in Conditions 20(b) through 20(d) until termination of fuel flow to the Gas Turbine. |
| Specified PAHs: | The polycyclic aromatic hydrocarbons listed below shall be considered to Specified PAHs for these permit conditions. Any emission limits for Specified PAHs refer |

120

|  | to the sum of the emissions for all six of the following compounds. |
|--|--|
|  | Benzo[a]anthracene |
|  | Benzo[b]fluoranthene |
|  | Benzo[k]fluoranthene |
|  | Benzo[a]pyrene |
|  | Dibenzo[a,h]anthracene |
|  | Indeno[1,2,3-cd]pyrene |

Corrected Concentration: The concentration of any pollutant (generally $NO_x$, CO, or $NH_3$) corrected to a standard stack gas oxygen concentration. For emission point P-1 (exhaust stack of S-1 Gas Turbine), emission point P-2 (exhaust stack of S-2 Gas Turbine) and P-3 (exhaust stack of S-3 Gas Turbine) the standard stack gas oxygen concentration is 15% $O_2$ by volume on a dry basis.

Commissioning Activities: All testing, adjustment, tuning, and calibration activities recommended by the equipment manufacturers and the SFERP construction contractor to insure safe and reliable steady state operation of the gas turbines, heat recovery steam generators, steam turbine, and associated electrical delivery systems.

Commissioning Period: The Period shall commence when all mechanical, electrical, and control systems are installed and individual system start-up has been completed, or when a gas turbine is first fired, whichever occurs first. The period shall terminate when the plant has completed performance testing, is available for commercial operation, and has initiated sales to the power exchange.

Precursor Organic
Compounds (POCs): Any compound of carbon, excluding methane, ethane, carbon monoxide, carbon dioxide, carbonic acid, metallic carbides or carbonates, and ammonium carbonate

CEC CPM: California Energy Commission Compliance Program Manager

SFERP: San Francisco Electric Reliability Project


## CONDITIONS FOR THE COMMISSIONING PERIOD

**AQ-1**  The owner/operator of the SFERP shall minimize emissions of carbon monoxide and nitrogen oxides from S-1, S-2, and S-3, Gas Turbine Combustors to the maximum extent possible during the commissioning period. Conditions 1 through 12 will only apply during the commissioning period as defined above. Unless otherwise

121

indicated, Conditions 13 through 42 will apply after the commissioning period has ended.

**Verification:** The project owner shall submit a monthly compliance report to the CPM specifying how this condition is being complied with.

**AQ-2**    At the earliest feasible opportunity, in accordance with the recommendations of the equipment manufacturers and the construction contractor, the owner/operator shall ensure that S-1, S-2, and S-3, Gas Turbine Combustors are tuned to minimize the emissions of carbon monoxide and nitrogen oxides.

**Verification:**    The project owner shall submit a monthly compliance report to the CPM specifying how this condition is being complied with.

**AQ-3**    At the earliest feasible opportunity, in accordance with the recommendations of the equipment manufacturers and the construction contractor, the owner/operator shall install, adjust, and operate A-1 through A-6, SCR and Oxidation Systems, to minimize the emissions of carbon monoxide and nitrogen oxides from S-1, S-2, and S-3, Gas Turbine Combustors.

**Verification:**    The project owner shall submit a monthly compliance report to the CPM specifying how this condition is being complied with.

**AQ-4**    Coincident with the as-designed operation of A-1 thru A-6, SCR and Oxidation Systems, pursuant to Parts 3, 8, 9 and 10 of this condition, the owner/operator shall ensure that the Gas Turbine Combustors (S-1, S-2, and S-3) comply with the $NO_x$ and CO emission limitations specified in Parts 20(a) through 20(d) of this condition.

**Verification:**    The project owner shall submit a monthly compliance report to the CPM specifying how this condition is being complied with.

**AQ-5**    The owner/operator of the SFERP shall prepare a plan describing the procedures to be followed during the commissioning of the gas turbines. The plan shall be submitted the District Engineering Division and the CEC CPM at least four weeks prior to first firing of S-1, S-2, or S-3, Gas Turbine Combustors. The plan shall include a description of each commissioning activity, the anticipated duration of each activity in hours, and the purpose of the activity. The activities described shall include, but not be limited to, the tuning of the Water Injection system, the installation and operation of the SCR systems and oxidation catalysts, the installation, calibration, and testing of the CO and $NO_x$ continuous emission monitors, and any activities requiring the firing of the Gas Turbine Combustors (S-1, S-2, and S-3) without abatement by their respective SCR and Oxidation Systems. No Gas Turbine Combustor (S-1, S-2, or S-3) shall be fired sooner than 28 days after the District receives the commissioning plan.

**Verification:**    The project owner shall submit a monthly compliance report to the CPM specifying how this condition is being complied with.

**AQ-6**     During the commissioning period, the owner/operator of the SFERP shall demonstrate compliance with Conditions 8 through 11 of this condition through the use of properly operated and maintained continuous emission monitors and data recorders for the following parameters:

- firing hours for each gas turbine (S-1, S-2, and S-3)
- fuel flow rates to each train
- stack gas nitrogen oxide emission concentrations at P-1, P-2, and P-3
- stack gas carbon monoxide emission concentrations P-1, P-2, and P-3
- stack gas oxygen or carbon dioxide concentrations P-1, P-2, and P-3

The owner/operator shall monitor the parameters and record at least once every 15 minutes (excluding normal calibration periods or when the monitor source is not in operation) for the Gas Turbine Combustors (S-1, S-2, and S-3). The owner/operator shall use District-approved methods to calculate heat input rates, $NO_x$ (as $NO_2$) mass emission rates, carbon monoxide mass emission rates, and $NO_x$ and CO emission concentrations, summarized for each clock hour and each calendar day. All records shall be retained on site for at least 5 years from the date of entry and made available to District personnel upon request.

**Verification:** The project owner shall submit a monthly compliance report to the CPM specifying how this condition is being complied with.

**AQ-7**     The owner/operator shall install, calibrate, and properly operate District-approved continuous emission monitors specified in Condition 6 prior to the first firing of the Gas Turbine Combustors (S-1, S-2, and S-3). After first firing of the turbines, the detection range of these continuous emission monitors must be adjusted as necessary to accurately measure the resulting range of CO and $NO_x$ emission concentrations. The type, specifications, and location of these monitors shall be subject to District review and approval (by the District's Source Test Section).

**Verification:** The project owner shall submit a monthly compliance report to the CPM specifying how this condition is being complied with. In addition, the project owner shall provide evidence of the District's approval of the emission monitoring system to the CPM prior to first firing of the gas turbines.

**AQ-8**     The owner/operator shall not exceed 100 hours of firing during the commissioning period of S-1, Gas Turbine Combustor without abatement of nitrogen oxide emissions by A-1, SCR System. Such

123

operation of S-1, Gas Turbine Combustor without abatement shall be limited to discrete commissioning activities that can only be properly executed without the SCR or Oxidation Catalyst Systems fully operational. Upon completion of these activities, the owner/operator shall provide written notice to the District's Engineering and Enforcement Divisions, and the unused balance of the 100 firing hours without abatement shall expire.

**Verification:**    The project owner shall submit a monthly compliance report to the CPM specifying how this condition is being complied with.

**AQ-9**    The owner/operator shall not exceed 100 hours of firing during the commissioning period of S-2, Gas Turbine Combustor without abatement of nitrogen oxide emissions by A-3, SCR System. Such operation of S-2, Gas Turbine Combustor without abatement shall be limited to discrete commissioning activities that can only be properly executed without the SCR or Oxidation Catalyst Systems fully operational. Upon completion of these activities, the owner/operator shall provide written notice to the District's Engineering and Enforcement Divisions, and the unused balance of the 100 firing hours without abatement shall expire.

**Verification:**    The project owner shall submit a monthly compliance report to the CPM specifying how this condition is being complied with.

**AQ-10**    The owner/operator shall not exceed 100 hours of firing during the commissioning period of S-3, Gas Turbine Combustor without abatement of nitrogen oxide emissions by A-5, SCR System. Such operation of S-3, Gas Turbine Combustor without abatement shall be limited to discrete commissioning activities that can only be properly executed without the SCR or Oxidation Catalyst Systems fully operational. Upon completion of these activities, the owner/operator shall provide written notice to the District Engineering and Enforcement Divisions. And the unused balance of the 100 firing hours without abatement shall expire.

**Verification:**   The project owner shall submit a monthly compliance report to the CPM specifying how this condition is being complied with.

**AQ-11**    The owner/operator shall calculate the total mass emissions of nitrogen oxides, carbon monoxide, precursor organic compounds, $PM_{10}$, and sulfur dioxide that are emitted by each Gas Turbine Combustor (S-1, S-2, and S-3) during the commissioning period. These emissions count towards the consecutive twelve-month emission limitations specified in Condition 23 of this condition.

**Verification:** The project owner shall submit in the monthly compliance report to the CPM specifying how this condition is being complied with.

**AQ-12**    Prior to the end of the Commissioning Period, the owner/operator shall conduct a District- and CEC-approved source test using external continuous emission monitors to determine compliance with Condition 18 of this condition. The source test shall determine $NO_x$, CO, and POC emissions during start-up and shutdown of the gas turbines. The POC emissions shall be analyzed for methane and ethane to account for the presence of unburned natural gas. The source test shall include a minimum of three start-up and three shutdown periods. No later than twenty working days before the execution of the source tests, the owner/operator shall submit to the District and the CEC Compliance Program Manager (CPM) a detailed source test plan designed to satisfy the requirements of this condition. The District and the CEC CPM will notify the owner/operator of any necessary modifications to the plan within 20 working days of receipt of the plan; otherwise, the plan shall be deemed approved. The owner/operator shall incorporate the District and CEC CPM comments into the test plan. The owner/operator shall notify the District and the CEC CPM within seven (7) working days prior to the planned source testing date. Source test results shall be submitted to the District and the CEC CPM within 60 days of the source testing date.

**Verification:** No later than 30 working days before the commencement of the source tests, the project owner shall submit to the District and the CPM a detailed source test plan designed to satisfy the requirements of this condition. The District and the CPM will notify the project owner of any necessary modifications to the plan within 20 working days of receipt of the plan; otherwise, the plan shall be deemed approved. The project owner shall incorporate the District and CPM comments into the test plan. The project owner shall notify the District and the CPM within seven (7) working days prior to the planned source testing date. Source test results shall be submitted to the District and the CPM within 60 days of the source testing date.

**Conditions for the Gas Turbine Combustors (S-1, S-2, and S-3)**

**AQ-13**    The owner/operator shall ensure that S-1, S-2 and S-3 gas turbine combustors are fired on PUC natural gas exclusively. (Basis: BACT for $SO_2$ and $PM_{10}$)

**Verification:** The project owner shall complete, on a monthly basis, a laboratory analysis showing the sulfur content of natural gas being burned at the facility. The daily sulfur analysis reports shall be incorporated into the quarterly compliance reports.

**AQ-14**    The owner/operator shall ensure that heat input rate to each Gas Turbine Combustor (S-1, S-2, and S-3) does not exceed 487.3 MM Btu per hour, averaged over one hour period. (Basis: 2-1-234)

**Verification:** As part of the quarterly and annual compliance reports, the project owner shall include information on the date, time, and duration of any violation of this permit condition.

**AQ-15**    Except during the commissioning period, the owner/operator of S-1, Gas Turbine Combustor shall properly operate and properly maintain A-1, Selective Catalytic Reduction (SCR) and A-2, Oxidation Catalyst Systems whenever fuel is combusted at the source and the A-1 catalyst bed has reached minimum operating temperature.  (Basis: BACT for $NO_x$ and CO)

**Verification:**   As part of the quarterly and annual compliance reports, the project owner shall include information on the date, time, and duration of any violation of this permit condition.

**AQ-16**    Except during the commissioning period, the owner/operator of S-2, Gas Turbine Combustor shall properly operate and properly maintain A-3, Selective Catalytic Reduction (SCR) and A-4, Oxidation Catalyst Systems whenever fuel is combusted at those sources and the A-3 catalyst bed has reached minimum operating temperature.  (Basis: BACT for $NO_x$ and CO)

**Verification:** As part of the quarterly and annual compliance reports, the project owner shall provide information on any major problem in the operation of the Oxidizing Catalyst and Selective Catalytic Reduction Systems for the Gas Turbines and HRSGs.  The information shall include, at a minimum, the date and description of the problem and the steps taken to resolve the problem.

**AQ-17**    Except during the commissioning period, the owner/operator of S-3, Gas Turbine Combustor shall properly operate and properly maintain A-5, Selective Catalytic Reduction (SCR) and A-6, Oxidation Catalyst Systems whenever fuel is combusted at the source and the A-5 catalyst bed has reached minimum operating temperature.  (Basis: BACT for $NO_x$ and CO)

**Verification:** As part of the quarterly and annual compliance reports, the project owner shall provide information on any major problem in the operation of the Oxidizing Catalyst and Selective Catalytic Reduction Systems for the Gas Turbines and HRSGs. The information shall include, at a minimum, the date and description of the problem and the steps taken to resolve the problem.

**AQ-18**    The owner/operator of the Gas Turbine Combustors (S-1, S-2, and S-3) shall comply with requirements (a) through (h) below under all operating scenarios, except requirements (a) through (h) do not apply during a gas turbine start-up or shutdown.  (Basis:  BACT and Toxic Risk Management Policy)

(a) Nitrogen oxide mass emissions (calculated in accordance with District-approved methods) at each P-1, P-2, and P-3 (the exhaust point for each Gas Turbine abated by SCR and Catalyst Oxidation) shall not exceed or 0.0090 lb/MM Btu (HHV).  (Basis:  BACT for $NO_x$)

(b) The nitrogen oxide emission concentration at each P-1, P-2, and P-3 shall not exceed 2.5 ppmv, on a dry basis, corrected to 15%

126

$O_2$, averaged over any rolling 1-hour period.  (Basis:  BACT for $NO_x$)

(c) Carbon monoxide mass emissions at each P-1, P-2, and P-3 shall not exceed 0.0089 lb/MM Btu (HHV) of natural gas fired, averaged over any rolling 3-hour period.  (Basis:  BACT for CO)

(d) The carbon monoxide emission concentration at each P-1, P-2, and P-3 shall not exceed 4 ppmv, on a dry basis, corrected to 15% $O_2$, averaged over any rolling 3-hour period. (Basis:  BACT for CO)

(e) Ammonia ($NH_3$) emission concentrations at each P-1, P-2, and P-3 shall not exceed 10 ppmv, on a dry basis, corrected to 15% $O_2$, averaged over any one-hour period.  The owner/operator shall verify, by continuous recording, the ammonia injection rate to A-1, A-3, and A-5, SCR Systems. The correlation between the gas turbine, A-1, A-3 and A-5, SCR System ammonia injection rates and the corresponding ammonia emission concentration at emission points P-1, P-2 and P-3 shall be determined in accordance with Part 25 of this condition. (Basis:  TRMP for $NH_3$)

(f) Precursor organic compound (POC) mass emissions (as $CH_4$) at each P-1, P-2, and P-3 shall not exceed 0.0025 lb/MM Btu of natural gas fired.  (Basis:  BACT)

(g) Sulfur dioxide ($SO_2$) mass emissions at each P-1, P-2, and P-3 shall not exceed 0.0028 lb/MM Btu of natural gas fired.  (Basis: BACT)

(h) Particulate matter ($PM_{10}$) mass emissions at each P-1, P-2, and P-3 shall not exceed 2.5 pounds per hour.  (Basis:  BACT)

**Verification:**  The project owner shall submit to the District and CPM, quarterly reports for the proceeding calendar quarter within 30 days from the end of the quarter.  The report for the fourth quarter can be an annual compliance summary for the preceding year.  The quarterly and annual compliance summary reports shall contain the following information:

(a) Operating parameters of emission control equipment, including but not limited to ammonia injection rate, $NO_x$ emission rate and ammonia slip.

(b) Total plant operation time (hours), number of startups, hours in cold startup, hours in warm startup, hours in hot startup, and hours in shutdown.

(c) Date and time of the beginning and end of each startup and shutdown period.

(d) Average plant operation schedule (hours per day, days per week, weeks per year).

(e) All continuous emissions data reduced and reported in accordance with the District approved CEMS protocol.

(f) Maximum hourly, maximum daily, total quarterly, and total calendar year emissions of $NO_x$, CO, $PM_{10}$, VOC and $SO_x$ (including calculation protocol).

(g) Fuel sulfur content (monthly laboratory analyses, monthly natural gas sulfur content reports from the natural gas supplier(s), or the results of a custom fuel monitoring schedule approved by the District.

(h) A log of all excess emissions, including the information regarding malfunctions/breakdowns.

(i) Any permanent changes made in the plant process or production, which would affect air pollutant emissions, and indicate when changes were made.

(j) Any maintenance to any air pollutant control system (recorded on an as-performed basis).

In addition, this information shall be maintained on site for a minimum of five (5) years and shall be provided to District personnel on request.

**AQ-19**  The owner/operator shall not exceed the regulated air pollutant mass emission rates from each of the Gas Turbine Combustors (S-1, S-2, and S-3) during a start-up or a shutdown as established below. (Basis: BACT)

|  | Start-Up (Lb/hour) | Shutdown (lb/hour) |
|---|---|---|
| Oxides of Nitrogen (as $NO_2$) | 40 | 40 |
| Carbon Monoxide (CO) | 10 | 10 |
| Precursor Organic Compounds (as $CH_4$) | 2 | 2 |

**Verification:** The project owner shall submit to the District and CPM the quarterly and annual compliance reports as required by **AQ-18**.

**AQ-20**  The owner/operator of the Gas Turbines (S-1, S-2 and S-3) shall not exceed the following daily limits for each turbine during any one calendar day. (Basis: Cumulative Increase)

| Daily Limits | lb/day |
|---|---|
| Oxides of Nitrogen (as $NO_2$) | 283 |
| Carbon Monoxide (CO) | 132 |
| Precursor organic Compounds (as $CH_4$) | 34 |
| Particulate Matter | 60 |
| Sulfur Dioxide ($SO_2$) | 33 |
| Ammonia ($NH_3$) | 156 |

**Verification:** The project owner shall submit to the District and CPM the quarterly and annual compliance reports as required by **AQ-18**.

**AQ-21**  The owner/operator shall ensure that the cumulative combined emissions from the Gas Turbine Combustors (S-1, S-2, and S-3) do

not exceed the following limits during any consecutive twelve-month period, including emissions generated during gas turbine start-ups and shutdowns:

- 39.8 tons of $NO_x$ (as $NO_2$) per rolling 365 day period;

- 27.9 tons of CO per rolling 365 day period;

- 7.7 tons of POC (as $CH_4$) per rolling 365 day period;

- 15 tons of $PM_{10}$ per rolling 365 day period; and

- 2.7 tons of $SO_2$ per rolling 365 day period.

    (Basis: Cumulative Increase)

**Verification:** The project owner shall submit to the District and CPM the quarterly and annual compliance reports as required by **AQ-18**.

**AQ-22**    The owner/operator shall ensure that the maximum projected annual toxic air contaminant emissions from the Gas Turbine Combustors (S-1, S-2, and S-3) not exceed the following limits:

- 2,110 pounds of formaldehyde per year

- 235 pounds of acetaldehyde per year

- 21 pounds of acrolein per year

- 19 pounds of benzene per year

Unless the following requirement is satisfied:

The owner/operator shall perform a health risk assessment using the emission rates determined by annual source test and the most current Bay Area Air Quality Management District-approved procedures and unit risk factors in effect at the time of the analysis. This risk analysis shall be submitted to the District and the CEC CPM within 60 days of the source test date. The owner/operator may request that the District and the CEC CPM revise the carcinogenic compound emission limits specified above. If the owner/operator demonstrates to the satisfaction of the APCO that these revised emission limits will result in a cancer risk of not more than 1.0 in one million, the District and the CEC CPM may, at their discretion, adjust the carcinogenic compound emission limits listed above. (Basis: TRMP)

**Verification:** The project owner shall submit to the District and CPM the quarterly and annual compliance reports as required by **AQ-18**.

**AQ-23**    The owner/operator shall demonstrate compliance with Conditions 14 through 15, 18(a) through 18(d), 19, 21(a), and 21(b) by using properly operated and maintained continuous monitors (during all hours of operation including equipment start-up and shutdown periods) for all of the following parameters in (a) through (d) below.

129

(a) Firing Hours and Fuel Flow Rates for each of the following sources: S-1, S-2, and S-3 combined.

(b) Carbon Dioxide ($CO_2$) or Oxygen ($O_2$) concentrations, Nitrogen Oxides (NOx) concentrations, and Carbon Monoxide (CO) concentrations at each of the following exhaust points: P-1, P-2, and P-3.

(c) Ammonia injection rate at A-1, A-3, and A-5, SCR Systems

(d) Water or steam injection rate at S-1, S-2, and S-3 Gas Turbine Combustors

The owner/operator shall record all of the above parameters measured in (a) though (d) every 15 minutes (excluding normal calibration periods) and shall summarize all of the above parameters for each clock hour. For each calendar day, the owner/operator shall calculate and record the total firing hours, the average hourly fuel flow rates, and average hourly pollutant emission concentrations. (Basis: District Regulations 1-520.1, 9-9-501, BACT, Offsets, Cumulative Increase)

**Verification:** At least 30 days before first fire, the project owner shall submit to the CPM a plan on how the measurements and recordings required by this condition will be performed.

**AQ-24**    The owner/operator shall use the parameters measured in Condition 23(a) through (d) and District-approved calculation methods to calculate the parameters below.

(a) Heat Input Rate for each of the following sources: S-1, S-2, and S-3.

(b) Corrected $NO_x$ concentrations, $NO_x$ mass emissions (as $NO_2$), corrected CO concentrations, and CO mass emissions at each of the following exhaust points: P-1, P-2, and P-3.

Applicable to emission points P-1, P-2, and P-3, the owner/operator shall record the parameters specified above at least once every 15 minutes (excluding normal calibration periods). (Basis:    District Regulations 1-520.1, 9-9-501, BACT, Offsets, Cumulative Increase)

**Verification:** At least 30 days before first fire, the project owner shall submit to the CPM a plan on how the measurements and recordings required by this condition will be performed.

**AQ-25**    As specified below, the owner/operator shall calculate and record the following data:

(a) total Heat Input Rate for every clock hour and the average hourly Heat Input Rate.

130

(b) on an hourly basis, the cumulative total Heat Input Rate for each calendar day for the following: each Gas Turbine and all three sources (S-1, S-2, and S-3).

(c) the average $NO_x$ mass emissions (as $NO_2$), and corrected $NO_x$ emission concentrations for every clock hour.

(d) the average CO mass emissions and corrected CO emission concentrations for every rolling 3-hour period.

(e) on an hourly basis, the cumulative total $NO_x$ mass emissions (as $NO_2$) and the cumulative total CO mass emissions, for each calendar day for the following: each Gas Turbine (S-1, S-2, and S-3) combined.

(f) for each calendar day, the average hourly Heat Input Rates, Corrected $NO_x$ emission concentrations, $NO_x$ mass emissions (as $NO_2$), corrected CO emission concentrations, and CO mass emissions for each Gas Turbine combined.

(g) On a daily basis, the cumulative total $NO_x$ mass emissions (as $NO_2$) and cumulative total CO mass emissions, for the previous consecutive twelve month period for all three sources (S-1, S-2, and S-3) combined.

(Basis:     District Regulations 1-520.1, 9-9-501, BACT, Offsets, Cumulative Increase)

**Verification**: The project owner shall submit to the District and CPM the quarterly and annual compliance reports as required by **AQ-18**.

**AQ-26**     To demonstrate compliance with Conditions **AQ-18(f), 18(g), 18(h), 21(c), 21(d) and 21(e)**, the owner/operator shall calculate and record on a daily basis, the Precursor Organic Compound (POC) mass emissions, Fine Particulate Matter ($PM_{10}$) mass emissions (including condensable particulate matter), and Sulfur Dioxide ($SO_2$) mass emissions from each power train.  The owner/operator shall use the actual Heat Input Rates calculated pursuant **AQ-28**, actual Gas Turbine Start-up Times, actual Gas Turbine Shutdown Times, and CEC and District-approved emission factors to calculate these emissions.  The calculated emissions shall be presented as follows:

(a) For each calendar day, POC, $PM_{10}$, and $SO_2$ emissions shall be summarized for: each power train (S-1, S-2, and S-3) combined.

(b) On a daily basis, the 365 day rolling average cumulative total POC, $PM_{10}$, and $SO_2$ mass emissions, for all three sources (S-1, S-2, and S-3) combined.

(Basis:  Offsets, Cumulative Increase)

**Verification:** The project owner shall submit to the District and CPM the quarterly and annual compliance reports as required by **AQ-18**.

**AQ-27**    To demonstrate compliance with Condition 22, the owner/operator shall calculate and record on an annual basis the maximum projected annual emissions of: Acetaldehyde, Acrolein, Formaldehyde and Benzene. Maximum projected annual emissions shall be calculated using the maximum Heat Input Rate of 5,847,600 MM Btu/year and the highest emission factor (pounds of pollutant per MM Btu of Heat Input) determined by any source test of the S-1, S-2, and S-3 Gas Turbine Combustors. (Basis: TRMP)

**Verification:** The project owner shall submit to the District and CPM the quarterly and annual compliance reports as required by **AQ-18**.

**AQ-28**    Within 120 days of start-up of the SFERP, the owner/operator shall conduct a District-approved source test at the exhaust point P-1, P-2, or P-3 to determine the corrected ammonia (NH$_3$) emission concentration compliance with Condition **AQ-18**(e). The source test shall determine the correlation between the heat input rates of each gas turbine S-1, S-2, and S-3 and NH$_3$ mass emissions. (Basis: TRMP)

**Verification:** The project owner shall notify the District and the CPM within seven (7) working days before the execution of the source tests required in this condition. Source test results shall be submitted to the District and to the CPM within 60 days of the date of the tests.

**AQ-29**    The owner/operator shall determine the SCR System ammonia injection rate and the corresponding NH$_3$ emission concentration at emission point P-1, P-2, or P-3. The source test shall be conducted over the expected operating range of the turbine (including, but not limited to minimum, 70%, 85%, and 100% load) to establish the range of ammonia injection rates necessary to achieve NO$_x$ emission reductions while maintaining ammonia slip levels. Continuing compliance with **AQ-18**(e) shall be demonstrated through calculations of corrected ammonia concentrations based upon the source test correlation and continuous records of ammonia injection rate. (Basis: TRMP)

**Verification:** The project owner shall notify the District and the CPM within seven (7) working days before the execution of the source tests required in this condition. Source test results shall be submitted to the District and to the CPM within 60 days of the date of the tests.

**AQ-30**    Within 120 days of start-up of the SFERP and on an annual basis thereafter, the owner/operator shall conduct a District-approved source test on exhaust points P-1, P-2, and P-3 while each Gas Turbine Combustor is operating at maximum load to determine compliance with **AQ-18 (a)**, **(b)**, **(c)**, **(d)**, **(f)**, **(g)**, and **(h)**, while each

Gas Turbine Combustor is operating at minimum load to determine compliance with Conditions **AQ-18(b)** and **(d)**, and to verify the accuracy of the continuous emission monitors required in **AQ-23**. The owner/operator shall test for (as a minimum): water content, stack gas flow rate, oxygen concentration, precursor organic compound concentration and mass emissions, nitrogen oxide concentration and mass emissions (as $NO_2$), carbon monoxide concentration and mass emissions, sulfur dioxide concentration and mass emissions, methane, ethane, and particulate matter ($PM_{10}$) emissions including condensable particulate matter. (Basis: BACT offsets)

**Verification:** Approval of the source test protocols, as required in condition 32, and the source test reports shall be deemed as verification for this condition. The project owner shall notify the District and the CPM within seven (7) working days before the execution of the source tests required in this condition. Source test results shall be submitted to the District and to the CPM within 60 days of the date of the tests.

**AQ-31**    Within 120 days of start-up of the SFERP and on a biennial basis (once every two years) thereafter, the owner/operator shall conduct a District-approved source test at the exhaust point P-1, P-2, or P-3 while the Gas Turbine Combustor is operating at maximum allowable operating rates to demonstrate compliance with **AQ-27**. If three consecutive biennial source tests demonstrate that the annual emission rates calculated pursuant to Part 27 for any of the compounds listed below are less than the BAAQMD Toxic Risk Management Policy trigger levels shown, then the owner/operator may discontinue future testing for that pollutant:

- Acetaldehyde $\leq 235$ pounds/year
- Acrolein $\leq 21$ pounds/year
- Benzene $\leq 19$ pounds/year
- Formaldehyde $\leq 2110$ pounds/year

(Basis: TRMP)

**Verification:** Approval of the source test protocols, as required in condition **AQ-16**, and the source test reports shall be deemed as verification for this condition. The project owner shall notify the District and the CPM within seven (7) working days before the execution of the source tests required in this condition. Source test results shall be submitted to the District and to the CPM within 60 days of the date of the tests.

**AQ-32**    The owner/operator shall obtain approval for all source test procedures from the District's Source Test Section and the CEC CPM prior to conducting any tests. The owner/operator shall comply with all applicable testing requirements for continuous emission monitors as specified in Volume V of the District's Manual of Procedures. The

owner/operator shall notify the District's Source Test Section and the CEC CPM in writing of the source test protocols and projected test dates at least 7 days prior to the testing date(s).  As indicated above, the owner/operator shall measure the contribution of condensable PM (back half) to the total $PM_{10}$ emissions.  However, the owner/operator may propose alternative measuring techniques to measure condensable PM such as the use of a dilution tunnel or other appropriate method used to capture semi-volatile organic compounds. Source test results shall be submitted to the District and the CEC CPM within 60 days of conducting the tests. (Basis:  BACT)

**Verification:**     Submitting and getting approval of the source test procedures is the verification of this condition.  The project owner shall notify the District and the CPM within seven (7) working days before the execution of the source tests required in this condition.  Source test results shall be submitted to the District and to the CPM within 60 days of the date of the tests.

**AQ-33**     The owner/operator of the SFERP shall submit all reports (including, but not limited to monthly CEM reports, monitor breakdown reports, emission excess reports, equipment breakdown reports, etc.) as required by District Rules or Regulations and in accordance with all procedures and time limits specified in the Rule, Regulation, Manual of Procedures, or Enforcement Division Policies & Procedures Manual. (Basis:  Regulation 2-6-502)

**Verification:** The project owner shall submit to the District and CPM the reports as required by procedures and time limits specified in the Rule, Regulation, Manual of Procedures, or Enforcement Division Policies & Procedures Manual.

**AQ-34**     The owner/operator of the SFERP shall maintain all records and reports on site for a minimum of 5 years.  These records shall include but are not limited to: continuous monitoring records (firing hours, fuel flows, emission rates, monitor excesses, breakdowns, etc.), source test and analytical records, natural gas sulfur content analysis results, emission calculation records, records of plant upsets and related incidents.  The owner/operator shall make all records and reports available to District and the CEC CPM staff upon request.  (Basis: Regulation 2-6-501)

**Verification:**  During site inspection, the project owner shall make all records and reports available to the District, ARB, EPA or CEC staff.

**AQ-35**     The owner/operator of the SFERP shall notify the District and the CEC CPM of any violations of these permit conditions.  Notification shall be submitted in a timely manner, in accordance with all applicable District Rules and Regulations, and the Manual of Procedures. Notwithstanding the notification and reporting requirements given in any District Rule, Regulation, or the Manual of Procedures, the owner/operator shall submit written notification (facsimile is

acceptable) to the Enforcement Division within 96 hours of the violation of any permit condition. (Basis: Regulation 2-1-403)

**Verification:** Submittal of these notifications as required by this condition is the verification of these permit conditions. In addition, as part of the quarterly and annual compliance reports of **AQ-18**, the project owner shall include information on the dates when these violations occurred and when the project owner notified the District and the CPM.

**AQ-36**    The owner/operator of SFERP shall provide adequate stack sampling ports and platforms to enable the performance of source testing. The location and configuration of the stack sampling ports shall be subject to BAAQMD review and approval.
(Basis: Regulation 1-501)

**Verification:** 120 days prior to construction of the turbine stacks, the project owner shall provide the District and CPM an "approved for construction" drawing showing the appropriate stack height and location of sampling ports and platforms. The project owner shall make the site available to the District, EPA and CEC staff for inspection.

**AQ-37**    Within 180 days of the issuance of the Authority to construct for the SFERP, the owner/operator shall contact the BAAQMD Technical Services Division (Source Test Section) regarding requirements for the continuous monitors, sampling ports, platforms, and source tests required by parts **AQ-23, 28, 29, 30,** and **31**. All source testing and monitoring must be conducted in accordance with the BAAQMD Manual of Procedures or EPA methods. (Basis: Regulation 1-501)

**Verification:** Compliance with this condition is the verification of this permit condition.

**AQ-38**    Prior to the issuance of the BAAQMD Authority to Construct for the SFERP, the owner/operator shall provide to the District valid emission reduction credit banking certificates in the amount of 45.8 tons/year of Nitrogen Oxides or equivalent as defined by District Regulations 2-2-302.1 and 2-2-302.2. (Basis: Offsets)

**Verification:** At least 30 days prior to issuance of the District's Authority to Construct, the project owner shall provide valid emission reduction credit banking certificates to the District and the CPM for approval.

**AQ-39**    Pursuant to BAAQMD Regulation 2, Rule 6, section 404.1, the owner/operator of the SFERP shall submit an application to the BAAQMD for a major facility review permit within 12 months of the issuance of the Authority to Construct. (Basis: Regulation 2-6-404.1)

**Verification:** The project owner shall submit to the CPM copies of the Federal (Title IV) Acid Rain and (Title V) Operating Permit within 30 days after they are issued by the District.

135

**AQ-40**    Pursuant to 40 CFR Part 72.30(b)(2)(ii) of the Federal Acid Rain Program, the owner/operator of the SFERP shall not operate any of the gas turbines until either: 1) a Title IV Operating Permit has been issued; 2) 24 months after a Title IV Operating Permit Application has been submitted, to the District whichever is earlier. (Basis: Regulation 2, Rule 7)

**Verification:** The project owner shall submit to the District and CPM the quarterly and annual compliance reports as required by **AQ-18**.

**AQ-41**    The owner/operator of SFERP shall comply with the continuous emission monitoring requirements of 40 CFR Part 60 or 75 (Appendix A; Specifications and Test procedures, and Appendix B; Quality Assurance and Quality Control Procedures). (Basis: Regulation 2, Rule 7)

**Verification:** At least 60 days prior to the installation of the CEMS, the project owner shall seek approval from the District for an emission monitoring plan.

**AQ-42**    The owner/operator shall take monthly samples of the natural gas utilized at the SFERP and analyze for the sulfur content using District-approved laboratory methods, or shall obtain certified analytical results from the gas supplier. The sulfur content test results shall be retained on site for a minimum of five years from the test date and shall be utilized to satisfy the requirements of 40 CFR Part 60, subpart GG. (Basis: Recordkeeping)

**Verification:** The project owner shall submit to the District and CPM the quarterly and annual compliance reports as required by **AQ-18**.

## B.    PUBLIC HEALTH

The public health analysis supplements the previous discussion on air quality and considers the potential public health effects from project emissions of toxic air contaminants.  In this analysis, we review the evidence concerning whether such emissions will result in significant adverse public health impacts that violate standards for public health protection.[25]

### SUMMARY AND DISCUSSION OF THE EVIDENCE

Project construction and operation will result in routine emissions of toxic air contaminants (TACs).    These substances are categorized as noncriteria pollutants because there are no ambient air quality standards established to regulate their emissions.[26]    In the absence of standards, state and federal regulatory programs have developed a health risk assessment procedure to evaluate potential health effects from these emissions.

The risk assessment consists of the following steps:

- Identify the types and amounts of hazardous substances that the SFERP could emit to the environment;

- Estimate worst-case concentrations of project emissions in the environment using dispersion modeling;

- Estimate amounts of pollutants to which people could be exposed through inhalation, ingestion, and dermal contact;[27] and

---

[25] This Decision discusses other potential public health concerns in the following sections.  The accidental release of hazardous materials is discussed in **HAZARDOUS MATERIALS MANAGEMENT** and **WORKER SAFETY AND FIRE PROTECTION**.  Electromagnetic fields are discussed in the section on **TRANSMISSION LINE SAFETY AND NUISANCE**.  Potential impacts to soils and surface water sources are discussed in the **SOIL AND WATER RESOURCES** section.  Hazardous and non-hazardous wastes are described in **WASTE MANAGEMENT**.

[26] Criteria pollutants are discussed in the **AIR QUALITY** section, *supra*.

[27] Exposure pathways, or ways in which people might come into contact with toxic substances, include inhalation, dermal (through the skin) absorption, soil ingestion, consumption of locally grown plant foods, and mother's milk.

- Characterize potential health risks by comparing worst-case exposure to safe standards based on known health effects. (Ex. 46, p. 4.7-6.)

Typically, the initial risk analysis for a project is preformed at a "screening level" which is designed to conservatively estimate actual health risks. The risks for screening purposes are based on examining conditions that would lead to the highest, or worst-case, risks and then using those conditions in the study. Such conditions include:

- Using the highest levels of pollutants that could be emitted from the plant;
- Assuming weather conditions that would lead to the maximum ambient concentration of pollutants;
- Using the type of air quality computer model which predicts the greatest plausible impacts;
- Calculating health risks at the location where the pollutant concentrations are estimated to be the highest;
- Assuming that an individual's exposure to cancer-causing agents occurs continuously for 70 years; and
- Using health-based standards designed to protect the most sensitive members of the population (i.e., the young, elderly, and those with respiratory illnesses). (Ex. 46, p. 4.7-7.)

The risk assessment process addresses three categories of health impacts: acute (short-term) health effects; chronic (long-term) non-cancer effects; and cancer risk (also long-term). Acute health effects result from short-term (one-hour) exposure to relatively high concentrations of pollutants. Chronic health effects are those which arise as a result of long-term exposure to lower concentrations of pollutants. The exposure period is considered to be approximately from twelve to one hundred percent of a lifetime, or from eight to seventy years. (*Id.*)

The analysis for non-cancer health effects compares the maximum project contaminant levels to safe levels called "reference exposure levels" or RELs. These are amounts of toxic substances to which even sensitive people can be exposed and suffer no adverse health effects. These exposure levels are

138

designed to protect the most sensitive individuals in the population such as infants, the aged, and people suffering from illness or disease which makes them more sensitive to the effects of toxic substance exposure. The RELs are based on the most sensitive adverse health effects reported, and include margins of safety.

For carcinogenic substances, the health assessment considers the risk of developing cancer and assumes that continuous exposure to the cancer-causing substance occurs over a 70-year lifetime. The risk that is calculated is not meant to project the actual expected incidence of cancer, but rather a theoretical upper-bound number based on worst-case assumptions. (Ex. 46, pp. 4.7-7 to 4.7-8.)

Cancer risk is expressed in chances per million, and is a function of the maximum expected pollutant concentration, the probability that a particular pollutant will cause cancer, and the length of the exposure period. Cancer risks for each carcinogen are added to yield total cancer risk. The conservative nature of the screening assumptions used means that actual cancer risks due to project emissions are likely to be considerably lower than those estimated.

If the screening analysis predicts no significant risks, then no further analysis is required. However, if risks are above the significance level then further analysis, using more realistic, site-specific assumptions is performed to obtain a more accurate assessment of potential public health risks. (Ex. 46, p. 4.7-8.)
A total[28] hazard index of less than one indicates that cumulative worst-case exposures are less than, or below, the safe levels. Cancer risks are calculated based on the total risk from exposure to all cancer causing chemicals. A significant increased lifetime cancer risk occurs if one excess case of cancer in

---

[28] The hazard index for every toxic substance which has the same type of health effect is added to yield a total hazard index. The total hazard index is calculated separately for acute and chronic effects.

139

an exposed population of 100,000 (equivalent to a risk of ten in one million or 10 x $10^{-6}$) is calculated to occur. (Ex. 46, pp. 4.7-2 to 4.7-10.)

Toxic emissions will be attributable to the project during both its construction and its operation phases. Applicant and Staff each performed an analysis of the impacts of the SFERP which evaluated potential cancer and non-cancer health risks to the public. (5/31/06 RT 78-80; Ex 46, pp. 4.7-1 to 4.7-143.) Staff also used a modeling tool recently developed by the California Air Resources Board (CARB) - the Hot Spots Analysis and Reporting Program (HARP) – which uses dispersion modeling to examine local cumulative toxic impacts and the extent of the SFERP's contribution to these impacts. (5/22/06 RT 299-304; Staff Opening Brief, pp. 16, 18.)

The evidence shows that, during the twelve month construction period, worst-case hourly dust emissions of 22.8 lb/day of particulate matter less than 10 microns ($PM_{10}$) and 10.9 lb/day of particulate matter less than 2.5 microns ($PM_{2.5}$) will occur. Diesel emissions from sources such as trucks, graders, cranes, welding machines, electric generators, air compressors, and water pumps will also occur. Modeling of construction activities including impacts of fugitive dust over a 12 month period resulted in a predicted annual average concentration of 1.1 µg/m$^3$ of $PM_{10}$ and 0.6 µg/m$^3$ of $PM_{2.5}$ at any location. (Ex. 46, p. 4.7-11.)

However, the evidence also establishes that mitigation measures contained in the **AIR QUALITY** portion of this Decision (e.g. Condition of Certification **AQ-SC5**) will reduce particulate matter emissions on the order of 85-92 percent through the use of ultra low sulfur diesel fuel. Tier 1 or 2 emissions standards for construction equipment, and the use of oxidation catalyst and soot filters on diesel equipment will also serve to mitigate construction impacts. (Ex. 46, pp. 4.7-11 to 4.7-12; Staff Opening Brief, p. 17.)

During operation, the emission sources at SFERP include three gas turbines and the two-cell cooling tower. The evidence of record explains, in depth, the methodology used in identifying and quantifying the emission rates of the toxic non-criteria pollutants which could adversely affect public health. (Ex. 46, pp. 4.7-12 to 4.7-16.) Basically, once potential emissions are identified, they are then quantified by conducting a "worst case" analysis. Maximum hourly emissions are used to calculate acute (one-hour) non-cancer health effects, while estimates of maximum emissions on an annual basis are used to calculate cancer and chronic (long-term) non-cancer health effects. (Ex. 46, p. 4.7-15.)

Ambient concentrations of toxic substances are then estimated by using a screening air dispersion model and assuming conditions that result in maximum impacts. Finally, ambient concentrations were used in conjunction with RELs and cancer unit risk factors to estimate health effects which might occur from exposure to facility emissions. (Ex. 46, p. 4.7-16.)

Applicant's screening health risk assessment for the project, including combustion and non-combustion emissions, resulted in a maximum acute hazard index of 0.03 and a maximum chronic hazard index of 0.002. As **PUBLIC HEALTH Table 1** shows, both acute and chronic hazard indices are under the REL of 1.0, indicating that no short- or long-term adverse health effects are expected.

### PUBLIC HEALTH Table 1
### Operation Hazard/Risk at Point of Maximum Impact

| Type of Hazard/Risk | Hazard Index/Risk | Significance Level | Significant? |
|---|---|---|---|
| ACUTE NONCANCER | 0.03 | 1.0 | No |
| CHRONIC NONCANCER | 0.002 | 1.0 | No |
| INDIVIDUAL CANCER | $0.046 \times 10^{-6}$ | $10.0 \times 10^{-6}$ | No |

Source: Ex. 46, p. 4.7-16.

141

As also shown in **PUBLIC HEALTH Table 1**, the calculated total worst-case individual cancer risk is 0.046 in one million at the location of maximum impact, which in this case is located in San Francisco Bay northeast of the proposed power plant. The calculated maximum cancer risk at the closest residence is 0.0008 in one million. (Ex. 46, p. 4.7-16.)

Staff reviewed the Applicant's modeling and also conducted an independent risk assessment for the SFERP project using the CARB's HARP modeling tool. The evidence further indicates that Staff conducted dispersion modeling and risk assessment for source emissions under the following scenarios:

- all sources at SFERP (3 combustion turbines and 2 cooling tower cells);
- SFERP combustion turbines only;
- SFERP cooling tower only.

Staff's analysis for cancer risk and non-cancer hazard due to emissions from all 5 on-site sources (3 combustion turbines and 2 cooling tower cells) at the SFERP facility showed a cancer risk of 0.073 in one million at the point of maximum impact (PMI), which is located to the east of the facility boundary at the construction laydown area. At the facility fenceline (conservatively assumed to be the location of the nearest workplace), cancer risk under the worker exposure scenario is 0.021 in one million. At the nearest residence located approximately 1,600 feet west of the facility, cancer risk is estimated to be 0.0014 in one million; at the nearest sensitive receptor located at Warm Water Cove Public Access (approximately 550 feet north of the facility), cancer risk is estimated to be 0.0027 in one million. Cancer risk at the maximally exposed sensitive receptor is 0.015 in one million at the Gloria B. Davis Middle School.

This independent modeling shows that all cancer risks due to emissions from SFERP are less than 1.0 in one million and that all chronic and acute non-cancer

hazard indices are less than 1.0. These results indicate a lack of non-cancer hazard from facility emissions at all receptors evaluated. (Ex. 46, p. 4.7-17.) Staff's results are summarized in **PUBLIC HEALTH Table 2**.

**PUBLIC HEALTH Table 2**
**Operation Hazard/Risk (Staff's Calculations)**

| Type of Hazard/Risk | Hazard Index/Risk | Significance Level | Significant? |
|---|---|---|---|
| ACUTE NONCANCER | 0.038 | 1.0 | No |
| CHRONIC NONCANCER | 0.0027 | 1.0 | No |
| INDIVIDUAL CANCER | $0.073 \times 10^{-6}$ | $10.0 \times 10^{-6}$ | No |

Source: (Ex. 46, p. 4.7-17.)

Staff also conducted further analysis of SFERP emissions in which cancer risk and non-cancer hazard were determined separately for the combustion turbines and the cooling towers. Results show that the majority of cancer risk estimated for the facility (0.073 in one million at the PMI located just outside the eastern facility boundary) is due to cooling tower emissions. (5/22/06 RT 299-302; Ex. 46, pp. 4.7-16 to 4.7-17.)

In conclusion, Staff's analysis, while differing slightly from Applicant's, nevertheless confirms that SFERP emissions would not present significant cancer risk or non-cancer hazards to any member of the public, including the low income and minority populations in the vicinity.

Intervenor Sarvey, however, contends that the analysis of record is insufficient in that it does not adequately account for cumulative impacts, including those identified in the 2001 "Southern Waterfront SEIR." (SEIR; marked for identification as Ex. 92b, but not received into evidence; 5/31/06 RT 44-45.) This intervenor combines concerns over public health and environmental justice, essentially contending that the record does not contain an adequate analysis of

the public health impacts upon a community "...already overburdened by pollution from industrial facilities." (Sarvey Opening Brief, p. 8; Reply Brief, pp. 10-11; July 21, 2006 Reply Brief to Staff Late Filing, p. 10.) The intervenor, however, offered no expert testimony to contradict that from Applicant and Staff summarized above.

In their respective post-hearing submissions, both Applicant and Staff thoroughly discount the validity of the intervenor's contentions by convincingly showing that an adequate cumulative impacts analysis has in fact been performed. This analysis included relevant projects identified in the SEIR and yielded results which clearly establish the lack of adverse public health impacts attributable to construction and operation of SFERP in conjunction with these other projects. (Applicant Opening Brief, pp. 53-69; Applicant Reply Brief, pp. 13-26; Staff Opening Brief, pp. 14-18; Staff Reply Brief, pp. 5-6.)

We have examined the evidence of record and find that it convincingly rebuts the contentions advanced by the intervenor. For example, Applicant's testimony explained the nature of its cumulative analysis at length (5/31/06 RT 73-113), and Staff showed that its analysis, based on recent developments in modeling as well as the inclusion of toxic emission point sources in the project vicinity (5/22/06 RT 300-302; Ex. 46, pp. 4.7-21 to 4.7-22) establishes that the SFERP will not cause adverse public health impacts. (Staff Opening Brief, pp. 16-18.) More specifically, as explained in Applicant's Opening Brief (at pages 54-56), the record establishes the following:

- the highest cancer risk for the project, based on Applicant's modeling, is 0.045 in one million, which is over 200 times lower than the ten in one million standard used by regulatory agencies;

- the highest cancer risk factor, based on Staff's modeling, is 0.073 in one million;

- the maximum cancer risk point, depending on the modeling used, is either in San Francisco Bay or the construction laydown area;

- the maximum cancer risk factor at the nearest residence is 0.0014 in one million, or over 7,000 times lower than the level of significance;

- diesel emissions during construction would result in an increased cancer risk of 0.75 to 1.1 in one million at the project fence line, but the analysis of record does not account for mitigation measures required in the Conditions of Certification;

- Applicant calculated the chronic (long-term) non-cancer health hazard for the project at 0.002 and Staff at 0.0027;

- the acute health hazard index for the project is 0.025 as calculated by Applicant, and 0.038 as calculated by Staff;

- a health hazard index of less than one indicates there is very little likelihood that adverse health effects could occur.

The most salient point to be gained from the extensive record on the cumulative analysis is perhaps most succinctly stated by Staff (Reply Brief, p. 6):

> "...many of the projects listed in the SEIR have apparently already been built, or involve only construction impacts (such as the Illinois Street Bridge project). They would thus not likely be cumulative to SFERP. However, even if one accepts uncritically the cancer risk numbers stated in Sarvey's brief, such cumulative numbers (the highest being 8.96 in one million), *even when added to project risk numbers* (0.073 in a million worst-case impact, east of the facility, in the industrial area; 0.0014 in one million at the nearest residence), would not toll the generally accepted significance criteria used for *single* projects—ten in one million. (See Ex. 46, p. 4.7-17, 21.) Thus Sarvey's conclusion regarding cumulative impact significance is unsupported even if his numbers are accepted." (Emphasis in original; see also, Applicant's Opening Brief at pp. 61-62, 65-66.)

No credible evidence of record rebuts these conclusions.

Intervenor Sarvey also advances his theory that the cumulative impact analysis of record is deficient on legal grounds. (Opening Brief, pp. 3-4.) Similarly, Sarvey's recitation of prior statements by one of Applicant's current witnesses-given while an advocate participating in the Waterfront SEIR process may be

145

historically interesting but is not probative concerning the sufficiency of the present cumulative impact analysis.   (See Sarvey Opening Brief, pp. 9-13.) Nothing offered by the intervenor, including his interpretation of CEQA's requirements (Opening Brief, p. 4), credibly suggests that the factual matters established in the current record, including the scope of the cumulative impact analysis, is either factually erroneous or legally insufficient.[29]

Finally, the record shows that in addition to being a source of potential toxic air contaminants, the possibility exists for bacterial growth, including Legionella, to occur in the cooling tower.  It is the principal cause of legionellosis, otherwise known as Legionnaires' Disease, which is similar to pneumonia.  Transmission to people results mainly from inhalation or aspiration of aerosolized contaminated water.   Untreated or inadequately treated cooling systems, such as industrial cooling towers and building heating, ventilating, and air conditioning systems, have been correlated with outbreaks of legionellosis.

According to the evidence of record, good preventive maintenance is very important in the efficient operation of cooling towers and other evaporative equipment.  Preventive maintenance includes having effective drift eliminators periodically cleaning the system if appropriate, maintaining mechanical components in working order, and maintaining an effective water treatment program with appropriate biocide concentrations.

In order to ensure that Legionella growth is kept to a minimum, Condition of Certification **PUBLIC HEALTH-1** is necessary.  The condition will require the project owner to prepare and implement a biocide and anti-biofilm agent monitoring program to ensure that proper levels of biocide and other agents are maintained within the cooling tower water at all times, that periodic

---

[29] Applicant thoroughly addresses these matters in its Reply Brief at pages 18-26. Staff's pointed response to the intervenor 's legal interpretation appears at pages 14-16 of its Opening Brief.`

measurements of Legionella levels are conducted, and that periodic cleaning is conducted to remove bio-film buildup. (5/22/06 RT 302; Ex. 46, p. 4.7-19.)

**FINDINGS AND CONCLUSIONS**

Based on the persuasive weight of the evidence of record, the Commission makes the following findings and conclusions:

1. Construction and normal operation of the project will result in the routine release of criteria and noncriteria pollutants that have the potential to adversely impact public health.

2. Potential construction-related adverse health effects from diesel emissions and fugitive dust will be mitigated to insignificant levels.

3. Emissions of criteria pollutants, which are discussed in the **AIR QUALITY** section of this Decision, will be mitigated to levels consistent with applicable standards.

4. Applicant performed a health risk assessment, using well-established scientific protocol, to analyze potential adverse health effects of toxic air contaminants.

5. The accepted method used by state regulatory agencies in assessing the significance for both acute and chronic noncarcinogenic public health effects is known as the hazard index method. A similar method is used for assessing the significance of potential carcinogenic effects.

6. Application of the hazard index method establishes that emission of non-criteria pollutants from the SFERP will not cause acute or chronic adverse public health effects.

7. The maximum non-cancer and the maximum cancer risks associated with the project are substantially below the significance thresholds commonly accepted for risk analysis purposes, even when considering the impacts of projects identified in the 2001 Southern Waterfront SEIR.

8. The project owner will implement a Cooling Water Management Plan in accordance with applicable LORS and guidelines to minimize the potential for growth of Legionella bacteria and other micro-organisms in cooling tower emissions.

147

9. Cumulative impacts from noncriteria pollutants were analyzed in accordance with the provisions of CEQA. Impacts from the SFERP's emissions of these pollutants are not expected to be significant.

10. Emissions from the construction, operation, and closure of the proposed natural gas-burning SFERP will not have a significant adverse impact on the public health of the surrounding population.

We therefore conclude that project emissions of noncriteria pollutants do not pose a significant direct, indirect, or cumulative adverse public health risk and that the project will comply with the applicable laws, ordinances, regulations, and standards specified in the appropriate portion of **Appendix A** of this Decision.

## CONDITION OF CERTIFICATION

**Public Health-1**    The project owner shall develop and implement a Cooling Water Management Plan to ensure that the potential for bacterial growth in cooling water is kept to a minimum.  The Plan shall be consistent with either Staff's "Cooling Water Management Program Guidelines" or with the Cooling Technology Institute's "Best Practices for Control of Legionella" guidelines but, in either case, the Plan must include sampling and testing for the presence of Legionella bacteria at least every six months.  After two years of power plant operations, the project owner may ask the Compliance Project Manager (CPM) to re-evaluate and revise the Legionella bacteria testing requirement.

**Verification:**    At least 60 days prior to the commencement of cooling tower operations, the Cooling Water Management Plan shall be provided to the CPM for review and approval.